UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　　　　　　Plaintiff,<br>　v.<br><br>VASSILIOS TRIKANTZOPOULOS<br>and NAVIS VENTURES LLC<br><br>　　　　　　　　　　Defendants, | Civil Action No.<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges the following against Defendants Vassilios Trikantzopoulos ("Trikantzopoulos") and Navis Ventures LLC ("Navis"):

## SUMMARY

1.  Since at least 2015, Trikantzopoulos has posed as the scion of a wealthy Greek shipping family and has claimed to be a highly successful money manager, responsible for overseeing $100 million dollars or more of family assets. Trikantzopoulos has claimed that Navis, which he controls, is the investment arm of the office that manages his family's fortune.

2.  Trikantzopoulos has used this charade of affluence, success, and financial sophistication to solicit investors for various international real estate ventures, pledging hefty profits and offering "secured" promises that, if the ventures did not go forward, investors' funds would be returned in full.

3.  In actuality, Navis has no substantial assets or operations, and Trikantzopoulos's representations of "secured" refunds are worthless. As for the investors' money, some has been

spent for business purposes with no apparent success, while Trikantzopoulos has pocketed tens of thousands for his own personal use, to pay rent, credit card bills, and the like.

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

4. The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)] and Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§78u(d) and 78u(e)].  The Commission seeks permanent injunctions against Trikantzopoulos and Navis, enjoining them from committing further violations of the relevant provisions of the federal securities laws; entry of a permanent injunction prohibiting specific conduct by Trikantzopoulos related to the violations alleged; disgorgement of all ill-gotten gains from the unlawful conduct set forth in this Complaint, together with prejudgment interest; civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and such other relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

5. The Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)], and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e), and 78aa].

6. Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §78aa], because Trikantzopoulos and Navis reside and transact business in the District of Massachusetts, and many of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the district.

7.  Defendants have, directly or indirectly, made use of the means and instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the acts, practices, and courses of business alleged in this complaint.

8.  Defendants' conduct took place both in the offer and sale of securities and in connection with the purchase and sale of securities.

## DEFENDANTS

9.  **Vassilios Trikantzopoulos**, age 54, is a resident of Boston, Massachusetts. Trikantzopoulos holds himself out as the leader of the Trikantzopoulos "family office." A family office is a privately held company that manages finances and investments for a wealthy family. Trikantzopoulos is the founder and sole control person of Navis Ventures LLC.

10.  **Navis Ventures LLC** is a limited liability company formed in Delaware in May 2017 to be the "investment arm" of Trikantzopoulos's family office. Trikantzopoulos operated Navis out of shared office space in Boston as well as his residence. Navis ceased operations in late 2019.

## TRIKANTZOPOULOS'S BACKGROUND

11.  Trikantzopoulos is a Greek citizen and a legal resident of the United States. He has lived in the United States since the late 1980s.

12.  Trikantzopoulos has held a series of jobs in the United States to support himself and his family. For example, from December 2010 until July 2017 he worked full-time at a concierge desk in residential buildings, earning a salary of approximately $33,000 per year. In addition, from August 2016 through June 2018, he earned money by driving for a rideshare company.

## TRIKANTZOPOULOS'S SCHEME TO SOLICIT INVESTMENTS BY POSING AS A WEALTHY AND SOPHISTICATED ASSET MANAGER

13.  In dealing with potential investors, Trikantzopoulos routinely holds himself out as a member of a wealthy Greek shipping family and as the leader of the office that manages his family's

3

finances.  He claims that he has led his family office since he was 24 years old; that the family assets under his management are more than $100 million; that he provides "due diligence" consulting services to other family offices; and that he has allowed other wealthy families to "co-invest" in various ventures, along with Trikantzopoulos family money, touting an "average return" that exceeds a variety of benchmarks in the U.S. public markets.

14.     As part of his charade, and as a key step toward contacting potential investors and luring them into his scheme, Trikantzopoulos has appeared as a panelist at various family office events and forums, including in December 2015 (in Miami, Florida) and July 2019 (in Newport, Rhode Island).  He has also attended other family office events in an attempt to solicit investments from wealthy families.

15.     Under this persona of financial sophistication and success, Trikantzopoulos has been soliciting investments in various entities he created to purportedly be the "investment arm" of his family office.  In early 2015, Trikantzopoulos formed the first of these entities, naming it 38 Ventures LLC ("38 Ventures").  In May 2017, he rebranded 38 Ventures by forming a new entity called Navis Ventures LLC.  In July 2019 he again rebranded, calling his new (and current) entity Pevadi Brothers LLC.

**SOLICITATION OF INVESTORS
FOR PURPORTED REAL ESTATE VENTURES**

16.     Over several months beginning in April 2015, Trikantzopoulos raised $60,000 from five investors by offering an investment in promissory notes under the 38 Ventures brand.  A promissory note is a financial instrument that contains a written promise by one party (here, 38 Ventures) to pay another party (the investor) a definite sum of money, either on demand or at a specified future date.

17. Trikantzopoulos's pitch was that 38 Ventures was brokering a deal for a group of Chinese families to purchase real estate in the United States. He claimed that both 38 Ventures and its investors would participate in the profits if the transactions occurred and, if not, 38 Ventures would refund the principal to each investor. Two people invested $5,000; two others invested $10,000; and one person invested $30,000. The investors were promised various profit amounts if the real estate deals occurred. For example, Trikantzopoulos promised one of the $5,000 investors that 38 Ventures would pay the investor $25,000 (a profit of 400% on the original investment) if the deals went through, or would refund the investor's money if the deals did not close.

18. No Chinese family real estate deals ever occurred, but Trikantzopoulos did not at that time pay back any of his investors. Instead, he pooled investor money and used it interchangeably for a combination of 38 Ventures expenditures and personal living expenses, including several checks made out to Trikantzopoulos's wife.

19. Trikantzopoulos lulled the investors with far-fetched representations to explain away his delays in repayment and with assurances of upcoming payments. For example, he emailed one of the $5,000 investors on November 22, 2016:

> I had, twice, the opportunity to return the principal to you, but new clients were scrutinizing expansion plans. The only part that I can assure you is that the principal is going to be return [sic] and we are even close to secure the profit. How? We have completely reboot the business to secure new clients: we received soft commitments of over $300MM last month from Middle Eastern investors who also want to secure that we start fresh with no liabilities. That basically says that if I want to lock them in, I have to pay back the principal (minimum) within a short period of time. To do this, we are in the process of transferring 3 ships to the company (new one per investor's request) that will allow the new investors to register and pay us. I will have the obligation to immediately cover the principal. This should not be a long process but with the holiday season some delays might be expected.

20. These claims about new clients, ships, and international investors ready to invest multi-millions were just part of Trikantzopoulos' illusion of success. In reality, 38 Ventures had no

clients or significant operations. In fact, the 38 Ventures' banking account had a negative balance from February 1, 2016 until June 1, 2016, when the bank closed out the account.

21. In September 2017, Trikantzopoulos (then operating under the Navis brand and with a new bank account he opened in June 2017) paid back three of the five investors (the two who had invested $5,000 and one of the two who had invested $10,000). The source of funds for repayment was not from the Chinese family investment Trikantzopoulos had pitched, but from money he obtained separately in the beginning of September 2017 for doing some consulting work.

22. Trikantzopoulos never repaid the other two investors (who had invested $30,000 and $10,000), but he persisted in soliciting new investments by continuing to showcase a veneer of wealth and success while concealing his true financial condition.

23. In mid-June 2018, Trikantzopoulos solicited an Ohio resident (whom he had first met two years earlier) to make a direct investment in Navis. As part of his scheme, Trikantzopoulos continued the charade of posing as the manager of his wealthy family's office and portraying Navis as a successful investment enterprise. The Ohio investor agreed to invest $250,000 in Navis, wiring the money on or around June 27, 2018.

24. In soliciting the investment, Trikantzopoulos made several material misrepresentations orally and in writing while hiding the risks associated with the investment, including actual use of investor's funds, Navis's insolvency, and the total inability to repay the Ohio investor as promised.

25. First, Trikantzopoulos claimed that he was putting together a consortium of wealthy families, including his own family, to purchase a South Korean company. Trikantzopoulos stated that the Ohio investor's money would be used as working capital to attract and retain new clients in Navis and for business expenses related to the Korean acquisition. In actuality, Trikantzopoulos

desperately needed money for personal purposes, and the same day he received the Ohio investor's funds, Trikantzopoulos immediately transferred $9,000 from the Navis bank account to his personal bank account to be used for ordinary living expenses.

26.     In total, during the six-months after receiving the Ohio investor's funds, Trikantzopoulos diverted over one-third of the investor's money for personal purposes, including paying down personal credit card debt.

27.     Second, Trikantzopoulos promised that if the acquisition occurred, Navis would pay the Ohio investor $750,000 (a profit of 200% on the original investment). Trikantzopoulos claimed that Navis would also profit as a result of the Trikantzopoulos family's partial ownership in the South Korean company, asserting that the South Korean company was a "cash cow" that had "huge contracts with the Chinese government for the extension of the airport." If the deal didn't occur by September 2018, Trikantzopoulos guaranteed repayment of the $250,000 principal. Trikantzopoulos represented that the investment was "very low risk," stating that the principal was "secured" by Navis's revenue stream, profit sharing, and fees. In actuality, Trikantzolopoulos knew the claimed "security" was worthless because Navis was insolvent.

28.     Trikantzopoulos knew, or was reckless or negligent in not knowing, that he had no means to make repayment because Navis had no clients, assets, or income, and had no discernible means of generating revenue or profits. In fact, during the three months prior to receiving the Ohio investor's funds, Navis's bank account had a negative balance, decreasing from $-10.38 on March 7, 2018 to a low of $-719.32 immediately before the investment on June 27, 2018. Thereafter, Trikantzopoulos drained down all $250,000 of the Ohio investor's money over the next six months, from June 27, 2018 through early January 2019, on a combination of Navis expenditures and personal expenses. During this period, Navis had no clients and generated no income.

29. Third, to boost the notion that Trikantzopoulos and Navis were operating a legitimate and substantial business, and to pressure the Ohio investor to move quickly, Trikantzopoulos claimed that that there were other competing investors but that Navis could only accept one.

30. For example, on June 21, 2018, Trikantzopoulos stated in an email to the Ohio investor, "[p]ersonally, I really would like to have you on board, however this might become a challenge as our executives are in talks with four Hedge Funds. We will have to go with the one that will be voted for and will commit first."

31. On June 25, 2018, Trikantzopoulos followed up in another email to the Ohio investor, "I just got off the conference call with my French partner and I was told that one of the hedge funds in France is also interested to participate. Although [the French partner] knows about your verbal commitment, without your signature and the registration fee I cannot really prevent [the French partner] from moving forward with his own proposition. Please update me on your status."

32. Trikantzopoulos knew, or was reckless or negligent in not knowing, that no hedge fund was about to invest in Navis.  This falsehood was merely part of Trikantzopoulos's overall scheme to create an appearance of legitimacy by making it sound like other monied investors were interested in his company.

33. Concealing these crucial facts rendered the statements and representations to the Ohio investor materially false and misleading.

34. The South Korean acquisition never occurred.

35. Trikantzopoulos never repaid the Ohio investor any money, despite repeated promises over time to do so.

36. Trikantzopoulos and Navis continued to solicit potential investors into 2019.

### FIRST CLAIM FOR RELIEF
### FRAUD IN THE OFFER OR SALE OF SECURITIES
(Violations of Section 17(a) of the Securities Act)

37. The Commission realleges and incorporates by reference the allegations in paragraphs 1 through 36 above.

38. By reason of the conduct described above, Trikantzopoulos and Navis, in the offer or sale of securities, by use of the means and instruments of transportation and communication in interstate commerce or by use of the mails, directly or indirectly, acting deliberately, with the intent to defraud, acting knowingly, acting with reckless disregard for the truth or falsity of statements, representations, and promises, and acting negligently, have (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operate or would operate as a fraud or deceit upon the purchaser.

39. By engaging in the conduct described above, Trikantzopoulos and Navis, directly or indirectly, violated and, unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### SECOND CLAIM FOR RELIEF
### FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES
(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder)

40. The Commission realleges and incorporates by reference the allegations in paragraphs 1 through 36 above.

41. By reason of the conduct described above, Trikantzopoulos and Navis, by engaging in the conduct described above, directly or indirectly, by the use of means or instrumentalities of

interstate commerce or use of the mails, in connection with the purchase or sale of securities, acting deliberately, with the intent to defraud, acting knowingly, and acting with reckless disregard for the truth or falsity of statements, representations, and promises, have (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business that operated or would operate as a fraud and deceit upon other persons.

42. By engaging in the conduct described above, Trikantzopoulos and Navis, violated, and unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court:

A. Enter a permanent injunction restraining the Defendants, their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction, from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

B. Enter a permanent injunction restraining Trikantzopoulos, directly or indirectly, including, but not limited to, through any entity owned or controlled by Trikantzopoulos, from participating in the issuance, purchase, offer, or sale of any security, provided, however, that such an injunction shall not prevent Trikantzopoulos from purchasing or selling securities for Trikantzopoulos's personal accounts.

    C.      Order the Defendants to disgorge, with prejudgment interest, all ill-gotten gains obtained by reason of the unlawful conduct alleged in this Complaint.

    D.      Order the Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

    E.      Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered.

    F.      Grant such other and further relief, including equitable, as this Court may deem just and appropriate.

## JURY DEMAND

The Commission demands a jury in this matter for all claims so triable.

DATED this 18th day of June, 2020

                                                  Respectfully submitted,

                                                  ____/s/ David H. London_____
                                                  David H. London (Mass. Bar. No. 638289)
                                                  Martin F. Healey (Mass. Bar. No. 227550)
                                                  *Counsel for Plaintiff*
                                                  SECURITIES AND EXCHANGE COMMISSION
                                                  Boston Regional Office
                                                  33 Arch Street, 24th Floor
                                                  Boston, MA 02110
                                                  (617) 573-8997 (London direct)
                                                  (617) 573-4590 (Facsimile)
                                                  LondonD@sec.gov  (London email)