**Page 1**

```
 1         UNITED STATES DISTRICT COURT
 2          DISTRICT OF MASSACHUSETTS
 3
 4   SECURITIES AND EXCHANGE     )
     COMMISSION,                 )
 5                               )
          Plaintiff,             )
 6                               )
     vs.               ) CASE NO.:
 7                     ) 20-cv-11156-RGS
     VASSILIOS TRIKANTZOPOULOS   )
 8   and NAVIS VENTURES, LLC,    )
                                 )
 9        Defendants.            )
     _____)
10
11
12
13
14          DEPOSITION OF
15        VASSILIOS TRIKANTZOPOULOS
16         VIA VIDEOCONFERENCE
17        Tuesday, April 20, 2021
18
19
20
21
22
23   Reported by:
24   Brigitte Rothstein, Stenographer
25   JOB NO. 210420BGR
```

**Page 2**

```
 1         UNITED STATES DISTRICT COURT
 2          DISTRICT OF MASSACHUSETTS
 3
 4   SECURITIES AND EXCHANGE     )
     COMMISSION,                 )
 5                               )
          Plaintiff,             )
 6                               )
     vs.               ) CASE NO.:
 7                     ) 20-cv-11156-RGS
     VASSILIOS TRIKANTZOPOULOS   )
 8   and NAVIS VENTURES, LLC,    )
                                 )
 9        Defendants.            )
     _____)
10
11
12
13
14
15
16      Deposition of VASSILIOS TRIKANTZOPOULOS
17   taken via videoconference on behalf of the Plaintiff,
18   beginning at 9:08 a.m. and ending at 1:18 p.m., on
19   Tuesday, April 20th, 2021, before Brigitte Rothstein,
20   Stenographer Court Reporter.
21
22
23
24
25
```

**Page 3**

```
 1   APPEARANCES:
 2   For the Plaintiff:
 3     UNITED STATES SECURITIES AND EXCHANGE
       COMMISSION
 4     BY:  RICHARD HARPER (BY VTC)
       Senior Trial Counsel
 5     -and-
       NITA KLUNDER (BY VTC)
 6     Senior Trial Counsel
       -and-
 7     DAVID H. LONDON (BY VTC)
       Senior Trial Counsel
 8     Boston Regional Office
       33 Arch Street
 9     Boston, Massachusetts 02110
       (617) 573-8897
10     harperr@sec.gov; klunderni@sec.gov;
       londond@sec.gov
11
12
13   For the Defendants:
14     VASSILIOS TRIKANTZOPOULOS (BY VTC)
       Pro se
15     basiltrikatz@gmail.com
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1                   INDEX
 2   WITNESS                  EXAMINATION
 3   VASSILIOS TRIKANTZOPOULOS
 4     BY MR. HARPER              6
 5
 6                  EXHIBITS
 7   NUMBER      DESCRIPTION          PAGE
 8   Exhibit 14  Email, 4/5/2021        8
 9   Exhibit 15  Email, 4/9/2021        9
10   Exhibit 16  SEC-HoodJane-E-0000019 - 21   15
11   Exhibit 17  SEC-HoodJane-E-0000012 - 13   18
12   Exhibit 18  NAVIS-VENTURES_00000796 - 797  24
13   Exhibit 19  SEC-HoodJane-E-0000003 - 5     28
14   Exhibit 20  Navis Ventures, LLC Bank
                 Statement              32
15
     Exhibit 16A Jakubowski Investment Contract  36
16
     Exhibit 21  NAVIS-VENTURES_00000586     41
17
     Exhibit 22  Email, 6/27/18           48
18
     Exhibit 23  SEC-AntonasC-E-0000017 - 18   49
19
     Exhibit 24  SEC-VT-E-0000067 - 72      52
20
     Exhibit 26  SEC-BOA-E-0001782 - 1791    55
21
     Exhibit 27  Email, 6/17/18           59
22
     Exhibit 28  NAVIS-VENTURES_00001412    68
23
     Exhibit 28A SEC-AntonasC-E-0000019      71
24
25
```

1  Exhibit 29  SEC-RegnauldJF- E-0000001 - 3    78
2  Exhibit 34  NAVIS-VENTURES_00000533 - 534    88
3  Exhibit 37  SEC-FulsW-E-0000030 - 35    96
4  Exhibit 38  SEC-BOA-E-0002003 - 2012    98
5  Exhibit 39  SEC-BOA-E0002209 -- 2220    103
6  Exhibit 40  REVTECH_VT_00001 -- 5    110
7  Exhibit 41  SEC-FulsW-E-0000020 - 21    113
8  Exhibit 42  SEC-FulsW-E-0000022    118
9  Exhibit 43  SEC-FTB-E-0000001 - 2    119
10  Exhibit 44  SEC-JPMCB-E-0000012 - 13    120
11  Exhibit 45  SEC-JPMCB-E-0000206 - 216    124
12  Exhibit 46  NAVIS-VENTURES_00000360 - 366    130
13  Exhibit 47  SEC-PS-P-0000010 - 16    138
14  Exhibit 48  SEC-PS-P-0000043 - 45    140
15  Exhibit 49  SEC-PS-P-0000047    151
16
17
18
19
20
21
22
23
24
25

5

1         Tuesday, April 20, 2021
2         9:08 a.m. - 1:18 p.m.
3              --oOo--
4         THE COURT REPORTER:  Go ahead and raise
5  your right hand, sir.
6         Do you swear or affirm that the
7  testimony you're about to give is the truth, the
8  whole truth, and nothing but the truth?
9         THE WITNESS:  Yes, I do.
10  WHEREUPON:
11         VASSILIOS TRIKANTZOPOULOS
12  having been first duly sworn, was examined and
13  testified as follows:
14              EXAMINATION
15  BY MR. HARPER:
16     Q     Please state your full name and spell your
17  last.
18     A     My first name is Vassilios, last name is
19  Trikantzopoulos, T-R-I-K-A-N-T-Z-O-P-O-U-L-O-S.
20     Q     And where are you joining us from today on
21  this Webex?
22     A     In United Arab Emirates.
23     Q     And what time is it there?
24     A     5:10 in the afternoon.
25     Q     Did you say 5:10 in the afternoon?

6

1     A     Yes.
2     Q     Okay.
3         Is anyone else present in the room with
4  you?
5     A     No.
6     Q     Other than the SEC and the Court Reporter
7  that is on video with us here on the Webex, have you
8  allowed anyone else to listen in to today's proceeding?
9     A     I have not allowed anybody else to be on
10  this proceeding.
11     Q     Okay.
12         So for today, have you ever been deposed
13  before?
14     A     Yes.  One time.
15     Q     And what kind of proceeding was that in?
16     A     With Mr. London.
17     Q     I see.
18         Other than giving testimony to Mr. London,
19  have you ever been deposed before?
20     A     Not as far as I know.  I don't remember
21  anything close to that, so --
22     Q     All right.
23         So today is going to be a lot like the
24  proceeding with Mr. London.  I'm going to ask you a
25  series of questions, and you'll give answers.  If you

7

1  don't understand a question that I'm asking, please say
2  so.  I will do my best to ask in a way that you will
3  understand.
4         Today is not meant to be a marathon.  If
5  you need to take a break to go to the bathroom, to get
6  a class of water, or anything, just let me know.  Okay?
7  The only thing that I'd ask is that you answer the
8  question that's pending at the time before we take a
9  break.  Okay?
10     A     Okay.
11     Q     Are you suffering from any ailments or
12  taking any medications that might affect your ability
13  to understand my questions or give truthful answers?
14     A     No.
15     Q     All right.
16         Before today, you received notice of this
17  deposition; is that correct?
18     A     If you're referring to receive notice by
19  Email, yes, I -- yes.  Correct.
20         (SEC Exhibit 14 was marked for
21         identification.)
22  BY MR. HARPER:
23     Q     Okay.  Great.
24         And as part of the Webex, I'm going to be
25  showing you some documents, and I'm going to show you

8

1 the first one now. We call them exhibits. So I'm
2 going to share that with you now.
3        What you should see on the screen in front
4 of you is a document that's been marked as Exhibit 14.
5 Do you so that?
6        **A**    I see that, yes.
7        **Q**    And it's an Email from Mr. London to you,
8 dated April 5th, 2021?
9        **A**    That's correct.
10       **Q**    And this Email sent you a copy of the
11 deposition notice, which is attached. It's the third
12 page, which I'm now showing you. Do you see the
13 deposition notice there for today?
14       **A**    Yes.
15       **Q**    Great.
16       And after you received this Email, you
17 sent a response to Mr. London a reply Email?
18       **A**    I don't remember.
19       **Q**    Okay.
20       (SEC Exhibit 15 was marked for
21       identification.)
22 BY MR. HARPER:
23       **Q**    So I'm now showing you on screen what has
24 been marked as Exhibit 15. Do you see it on your
25 screen?

9

1        **A**    Yes, I do.
2        **Q**    And this is an Email from you to
3 Mr. London, dated April 9th, 2021?
4        **A**    That's correct. Yes.
5        **Q**    And it's a reply to the Email that he sent
6 you that we just looked at that was Exhibit 14, right?
7        **A**    That's correct.
8        **Q**    And in your Email, you say that you're
9 available for your deposition on the 20th?
10       **A**    Yes.
11       **Q**    And today's the 20th, and we're having
12 your deposition, right?
13       **A**    Well, I'm available in front of you, yes.
14 Correct.
15       **Q**    All right.
16       So you are aware that your prior counsel,
17 Burns & Levinson, is no longer representing you in this
18 matter, right?
19       **A**    Yes.
20       **Q**    And after you became aware that Burns &
21 Levinson would be seeking to withdraw their
22 representation, did you consult with any other lawyers
23 concerning this case?
24       **A**    I'm taking the Fifth.
25       **Q**    All right.

10

1        When you say you're taking the Fifth, does
2 that mean that you're asserting your Fifth Amendment
3 privilege against self-incrimination?
4        **A**    That's correct.
5        **Q**    All right.
6        How long have you been outside of the
7 United States?
8        **A**    Since January 24th of 2020.
9        **Q**    2020?
10       **A**    That's correct. Yeah.
11       **Q**    And where have you been living during this
12 period that you've been outside the United States?
13       **A**    Greece and the Emirates.
14       **Q**    And where are you living currently?
15       **A**    I'm take the Fifth. And you already know
16 that.
17       **Q**    Okay.
18       What are you doing now for work?
19       **A**    I'm taking the Fifth.
20       **Q**    What are all the sources of funds you have
21 used for living expenses while you've been outside the
22 United States?
23       **A**    I'm taking the Fifth.
24       **Q**    Have you used any investor money to pay
25 for living expenses for you or your family since you've

11

1 been outside the United States?
2        **A**    I'm taking Fifth.
3        **Q**    Do you have an investment business that
4 you are promoting now?
5        **A**    I'm taking the Fifth.
6        **Q**    If so, what is that business?
7        **A**    I'm taking the Fifth.
8        **Q**    In operating any investment business, are
9 you using entities that are located within the United
10 States?
11       **A**    I'm taking the fifth.
12       **Q**    Okay.
13       Do you intend to assert the Fifth
14 Amendment privilege against self-incrimination
15 concerning all questions about how you're making a
16 living outside the United States?
17       **A**    I am asserting my Fifth Amendment -- I'm
18 not sure about the expression, but I'm sure you
19 understand what I'm saying -- to every questions from
20 now on.
21       **Q**    Okay.
22       You previously gave testimony before the
23 Commission back in November of 2019, right?
24       **A**    That's correct. Yeah.
25       **Q**    And Mr. London was there and asked you

12

1  questions?
2      **A**    That's correct.  There was an additional
3  individual there, also.
4      **Q**    Okay.
5          And it was an accountant, right, the other
6  person that was there?
7      **A**    Yeah.  Forensic accountant, correct.
8  Yeah.
9      **Q**    Okay.
10         And during that investigation testimony,
11  we asked you questions about your 38 Ventures business?
12         Do you need me to reask the question?
13     **A**    No, I don't need you to -- ask the
14  question again.
15     **Q**    Sure.
16         During that testimony, we asked you
17  questions about your 38 Ventures business?
18     **A**    I'm not following.
19     **Q**    Sure.
20         During the testimony that you gave when
21  Mr. London was asking questions back in 2019, we asked
22  you questions about your 38 Ventures business; is that
23  correct?
24     **A**    I don't remember.  I'm sure there were
25  questions about past activities.

13

1      **Q**    Okay.
2          You had a business, entity called 38
3  Ventures, right?
4      **A**    Right.
5      **Q**    And one of the investors in that business
6  was a woman named Jane Hood, right?
7      **A**    I'm taking the Fifth.  I don't recall any
8  investor like that necessarily.  I'm take the Fifth.
9  That's all.
10     **Q**    You're saying two things; one is that you
11  don't recall, and the other is that you're asserting
12  the Fifth.  So I'm going to ask you the question again.
13  You can decide whether or not you're going to answer
14  it, whether you're going to take the Fifth.  Okay?
15         One of the investors in 38 Ventures was
16  Jane Hood?
17     **A**    I'm taking the Fifth.
18     **Q**    How did you come to know Jane Hood?
19     **A**    I'm taking the Fifth.
20     **Q**    Why did you ask her to invest in 38
21  Ventures?
22     **A**    I'm taking the Fifth.
23     **Q**    Ms. Hood, after speaking with you about 38
24  Ventures, invested five thousand dollars in that
25  business, right?

14

1      **A**    I'm taking the Fifth.
2          (SEC Exhibit 16 was marked for
3          identification.)
4  BY MR. HARPER:
5      **Q**    Okay.  I'm now showing you on screen
6  what's been marked as Exhibit 16.  Do you see that on
7  your screen?
8      **A**    Yes, I do.
9      **Q**    And I'm just going to scroll through it,
10  so you can see each the pages.  Okay?
11     **A**    Uh-huh.
12     **Q**    Sorry.  You can't say uh-huh.  You have to
13  give a verbal response.  Are you seeing the pages as
14  I'm scrolling through?
15     **A**    It's on my screen.
16     **Q**    Okay.
17         Do you see now page two of three?
18     **A**    Yes, sir.
19     **Q**    Do you see now page three of three?
20     **A**    Yes, sir.
21     **Q**    Is that your signature on page three?
22     **A**    I'm taking the Fifth.
23     **Q**    So what I've just showed you, Exhibit 16
24  is a copy of Mrs. Hood's -- or excuse me, Ms. Hood's
25  investment contract; isn't that right?

15

1      **A**    Uh-huh.
2      **Q**    I'm sorry?
3      **A**    Yes.
4      **Q**    And if we go back to page three, which I'm
5  showing you on screen now, is that Ms. Hood's signature
6  above the typed line note holder?
7      **A**    I'm taking the Fifth.  I do not know.
8      **Q**    And she signed this contract on or about
9  April 20th, 2015, as noted on page three of Exhibit 16?
10     **A**    I'm taking the Fifth.
11     **Q**    And in return for Ms. Hood's five thousand
12  dollar investment, she would receive her principal
13  investment back, plus five percent interest, plus an
14  investment return of up to four times of her
15  contribution amount of five thousand dollars, right?
16     **A**    I'm taking the Fifth.
17     **Q**    And as reflected in this investment
18  contract, Ms. Hood's main objective in investment in 38
19  Ventures was to fund the business so that it could be
20  profitable and pay her the collateral benefit of an
21  investment return?
22     **A**    I'm taking the Fifth.
23     **Q**    The amount of her return -- investment
24  return depended on the success of 38 Ventures as a
25  business, correct?

16

1    **A**    I'm taking the Fifth.
2    **Q**    And the amount of her investment would
3  increase the more 38 Ventures was able to generate
4  sales revenue from deal making?
5    **A**    I'm taking the Fifth.
6    **Q**    And Ms. Hood's expectation of any profits
7  was dependent on your entrepreneurial efforts, right?
8    **A**    I'm taking the Fifth.
9    **Q**    She was not a part of 38 Ventures
10  management or operations?
11    **A**    I'm taking the Fifth.
12    **Q**    Now, the investment contract called for
13  Ms. Hood to be paid her principal back in November of
14  2015; is that right?
15    **A**    I'm taking the Fifth.
16    **Q**    But she was not paid back her five
17  thousand dollars in November of 2015, correct?
18    **A**    I'm taking the Fifth.
19    **Q**    Why was Ms. Hood not paid back?
20    **A**    I'm taking the Fifth.
21    **Q**    Isn't it fair to say that as of
22  November 15th, 2015, 38 Ventures did not have five
23  thousand dollars to pay back Ms. Hood?
24    **A**    I'm taking the Fifth.
25    **Q**    And in the year 2016, 38 Ventures did not

17

1  back Ms. Hood's principal of five thousand dollars,
2  right?
3    **A**    I'm taking the Fifth.
4    **Q**    And that's because 38 Ventures did not
5  have the five thousand dollars to pay her back?
6    **A**    I'm taking the Fifth.
7    **Q**    Okay.
8        (SEC Exhibit 17 was marked for
9        identification.)
10  BY MR. HARPER:
11    **Q**    I'm now going to show you what's been
12  marked as Exhibit 17.  Do you see that on screen before
13  you?
14    **A**    Yes, I do.
15    **Q**    You broke up a little bit.  Did you say,
16  yes, I do?
17    **A**    Yes, I do.
18    **Q**    Thank you.
19        And do you see that Exhibit 17 -- I'm
20  scrolling now through it for you -- is an exchange of
21  Emails between you and Ms. Hood?
22    **A**    I see.
23    **Q**    Okay.
24        So I'd like to start with the first Email
25  in time, which is at the bottom of page two of this

18

1  exhibit.  Do you see that Email there at the bottom
2  from Jane Hood, dated November 22nd, 2016 that starts,
3  Hi, thanks, Basil?
4    **A**    Yes, I do see it.
5    **Q**    And this Email was sent about a year after
6  38 Ventures was due to pay Ms. Hood her principal
7  investment of five thousand dollars, right?
8    **A**    Whatever date is that, yeah.
9    **Q**    I'm sorry.  I didn't catch that last part.
10    **A**    The date that's on the screen.  I don't
11  see very well.  Yes.  What, you know -- yeah.
12    **Q**    Under the contract, Ms. Hood was due to be
13  paid in November of 2015, right?
14    **A**    Correct.
15    **Q**    And this Email is a year later in November
16  of 2016, right?
17    **A**    That's correct.
18    **Q**    And as of that point, she had not been
19  paid back her principal investment, right?
20    **A**    I'm taking the Fifth.
21    **Q**    Okay.
22        In Ms. Hood's first Email, she says, It's
23  unnerving when you go off the grid, right?
24    **A**    I'm taking the Fifth.
25    **Q**    All right.

19

1        And then if we go up to the top of page
2  two of Exhibit 17, we see an Email from you to
3  Ms. Hood, dated November 22nd, 2016?
4    **A**    Uh-huh.
5    **Q**    I'm sorry.  Are you saying yes?
6    **A**    Yes, there's an Email on my screen.  Yes.
7    **Q**    Okay.  And it's a reply Email from you?
8    **A**    That's correct.
9    **Q**    And in that reply, you say your situation
10  has become more promising, but the delays and
11  obligations, like Ms. Hood's contribution, have taken a
12  toll on you?
13    **A**    I'm taking the Fifth.
14    **Q**    And you're talking about her five thousand
15  dollar investment, right?
16    **A**    I'm taking the Fifth.
17    **Q**    And in that first paragraph of that Email,
18  you say, "The only part that I can assure you is that
19  the principal is going to be returned, and we are even
20  close to secure the profit.  How?"  Do you see that?
21        Do see that portion of the Email,
22  Mr. Trikantzopoulos?
23    **A**    No.  What portion of the Email?  I'm not
24  sure if I follow you.
25    **Q**    Sure.

20

1        You see the first paragraph that starts,
2  Unnerving, doubling question mark?
3      **A**    That's correct.  Yeah.
4      **Q**    And then at the end of that particular
5  paragraph, there are two sentences.  One says, "The
6  only part that I can assure you is that the principal
7  is going to be returned, and we are even close to
8  secure the profit."  Do you see that first sentence
9  there?
10     **A**    Yes, I do.
11     **Q**    And then you say, "How, question mark,"
12  right?
13        And then you go on to say in the next
14  paragraph, "We have completely reboot the business to
15  secure new clients.  We received soft commitments of
16  over three hundred MM dollars last month from Middle
17  Eastern investors who also want to secure that we start
18  fresh with no liabilities."  Do you see that?
19     **A**    I do.
20     **Q**    And the three hundred MM dollars, does
21  that mean three hundred million dollars?
22     **A**    I'm taking the Fifth.
23     **Q**    Who were the Middle Eastern investors that
24  made soft commitments to invest three hundred million
25  dollars?

                          21

1      **A**    I'm taking the Fifth.
2      **Q**    Were they going to invest in that three
3  hundred million dollars of 38 Ventures?
4      **A**    I'm taking the Fifth.
5      **Q**    Why would Middle Eastern investors that
6  were going to invest three hundred million dollars care
7  about Jane Hood's five thousand dollars?
8      **A**    I'm taking the Fifth.
9      **Q**    Isn't five thousand dollars an incredibly
10  small percentage of three hundred million?
11     **A**    I'm taking the Fifth.
12     **Q**    Isn't it like about point zero zero one
13  six seven percent?
14     **A**    I'm taking the Fifth.
15     **Q**    Why would Middle Eastern investors
16  thinking of investing three hundred million dollars
17  care about such a tiny obligation?
18     **A**    I'm taking the Fifth.
19     **Q**    In the next paragraph of the Email that's
20  marked as Exhibit 17, your Email says, "To do this, we
21  are in the process of transferring three ships to the
22  company, open parens, new one per investor's request,
23  close paren), that will allow the new investors to
24  register and pay us, period.  I will have the
25  obligation to immediately cover the principal, period."

                          22

1  Do you see that?
2      **A**    Yes, I do.
3      **Q**    When you said, We are in the process of
4  transferring three ships to the company, did that mean
5  38 Ventures?
6      **A**    I'm taking the Fifth.
7      **Q**    When you said, That will allow the new
8  investors to register and pay us, who is us?
9      **A**    I'm taking the Fifth.
10     **Q**    What entity are you referencing there?
11     **A**    I'm taking the Fifth.
12     **Q**    Why would that result in money being paid
13  to 38 Ventures?
14     **A**    I'm taking the Fifth.
15     **Q**    Now, the deal that you're talking about
16  here in Exhibit 17 never came to fruition; isn't that
17  correct?
18     **A**    I'm taking the Fifth.
19     **Q**    38 Ventures never paid Ms. Hood using
20  money received from Middle Eastern investors, right?
21     **A**    I'm taking the Fifth.
22     **Q**    38 Ventures, as an entity, never paid
23  Ms. Hood any of her principal investment, right?
24     **A**    I'm taking the Fifth.
25     **Q**    In the first part of 2017, you closed down

                          23

1  38 Ventures and started a new company called Navis
2  Ventures; isn't that right?
3      **A**    I'm taking the Fifth.
4      **Q**    Okay.
5        (SEC Exhibit 18 was marked for
6        identification.)
7  BY MR. HARPER:
8      **Q**    All right.  I'm going to now show you
9  what's been marked as Exhibit 18.  Do you have it
10  before you?
11     **A**    Yes, I do.
12     **Q**    And do you see that Exhibit 18 is another
13  series of Emails between you and Jane Hood?
14     **A**    Yes, I do.
15     **Q**    Okay.
16        All right.  So I'd like to start by asking
17  you questions about the Email earliest in time, which
18  starts on the bottom of page one of Exhibit 18.  It
19  goes on to the second page.  It's an Email dated
20  May 30th, 2017.  Do you see it on the screen before
21  you?
22     **A**    Yes.
23     **Q**    All right.
24        So you write to Ms. Hood from an Email
25  address that is basil@noah-capital.com.  Do you see

                          24

1    that?
2        A    Yes, I do.
3        Q    Is Basil a nickname that you've used?
4        A    I don't know what the nickname means.
5    It's a name that I have.  It's a translation of my
6    Basili name.  That's all.
7        Q    Oh, very well.  It's a translation.  Thank
8    you.
9        A    It's a William or Basil, Bill, or Basili.
10        Q    In the United States, have you gone by
11    both William and Basil?
12        A    I have gone to different names depending
13    on my audiences.  They don't know how to spell my last
14    name anyway, so --
15        Q    All right.
16            And also in your signature block
17    underneath your name -- or next to your name, it says,
18    Managing partner, and then underneath that it refers to
19    Noah Capital?
20        A    Uh-huh.
21        Q    Do you see that?
22        A    Yes, I see.
23        Q    What is Noah Capital?
24        A    I'm taking the Fifth.
25        Q    Did you create it?

25

1        A    I'm taking the Fifth.
2        Q    How long did it exist?
3        A    I'm taking the Fifth.
4        Q    Did anyone, other than you, work for Noah
5    Capital?
6        A    I'm taking the Fifth.
7        Q    Did anyone invest money in Noah Capital?
8        A    I'm taking the Fifth.
9        Q    Did you solicit any prospective investors
10    to invest money in Noah Capital?
11        A    I'm taking the Fifth.
12        Q    Have you ever received an investment of
13    money from investors in Noah Capital?
14        A    I'm taking the Fifth.
15        Q    Do you intend to assert the Fifth
16    Amendment privilege against self-incrimination
17    concerning all questions about Noah Capital?
18        A    Correct.
19        Q    In the Email that's on the screen in
20    Exhibit 18, it says, "I had to create a different
21    entity that is to acquire the assets."  Do you see
22    that?
23        A    Yes, I do.
24        Q    What are you talking about here?
25        A    I'm taking the Fifth.

26

1        Q    What are the assets that you were
2    referring to?
3        A    I'm taking the Fifth.
4        Q    What entity was going to acquire them?
5        A    I'm taking the Fifth.
6        Q    Further in the Email in that paragraph,
7    you say, "This is a matter that will conclude next
8    week.  Five thousand dollars principal, comma, five X
9    multiple for profits.  If you have any questions,
10    comma, let's talk tomorrow, please, period."  Do you
11    see that?
12        A    I see it.
13        Q    And you did not pay Ms. Hood her principal
14    or profit in the first week of June 2017, right?
15        A    I'm taking the Fifth.
16        Q    So if we move up in Exhibit 18, we see
17    above your May 30th, 2017 Email an Email from Ms. Hood
18    to you on June 22nd, 2017 in which we asks you, "How's
19    it coming?"  Do you see that?
20        A    Yes.
21        Q    And then above this Email, there's a reply
22    from you to Ms. Hood on June 22nd, 2017 that starts, "I
23    had to retain a local law firm."  Do you see that?
24            Do you see that reply,
25    Mr. Trikantzopoulos?

27

1        A    I see that, yes.
2        Q    Okay.
3            And in that Email you say, "I had to
4    retain a local law firm, which finishing today an
5    agreement for the wire, period.  We should be
6    responding, comma, starting with principal, comma,
7    immediately with the receipt of the wire, which should
8    be on the 3rd of July, period."  Do you see that?
9        A    Yes, I do.
10        Q    But you did not pay Ms. Hood her principal
11    or profit in July of 2017, right?
12        A    I'm taking the Fifth.
13        Q    And if we go to the top of Exhibit 18,
14    there's an Email from Ms. Hood, dated July 13th, 2017
15    to you.  Do you see that?
16        A    I do.
17        Q    And she says, "Basil, where are we on
18    this?"
19        A    That's correct.
20        Q    All right.
21            (SEC Exhibit 19 was marked for
22            identification.)
23    BY MR. HARPER:
24        Q    So let's go now to Exhibit 19.  I'm
25    showing you now on screen what has been marked as

28

1  Exhibit 19.
2      A    Uh-huh.
3      Q    And do you see that there is -- if we go
4  down to the first -- if we go down to the bottom of the
5  first page, do you see the Email July 13th, 2017 from
6  Ms. Hood asking you -- saying, "Basil, comma, where are
7  we on this?"
8      A    Yes.
9      Q    Okay.
10         And then above it there's a reply Email
11  from you to Ms. Hood, dated July 14th, 2017?
12     A    Yes.
13     Q    And in this Email you say, "I am not sure
14  what you refer as sixty days, but your point is direct
15  and understandable to the extent there are too many
16  speed bumps, period.  I'm one hundred accountable for
17  this, period.  The only delay we have been experiencing
18  since April is solely based on one investor who has
19  been affecting everyone else, period.  If I capitulate
20  to his expectations, comma, the principal is
21  distributed, but the profits are locked for longer,
22  which will make others very unhappy, period.  Most got
23  into this for one main reason, colon:  The profits and
24  their trust in me knowing that the only risk is the
25  time tables, open parens, which any opportunity

29

1  delivering three X, hyphen, five X is expected to have,
2  close parens, period."  Do you see that?
3      A    I do.
4      Q    Who was the one investor that was
5  affecting everyone else?
6      A    I'm taking the Fifth.
7      Q    Please explain why this investor's actions
8  prevented you from paying Ms. Hood her five thousand
9  dollar principal?
10     A    I'm taking the Fifth.
11     Q    In this Email that's been marked as
12  Exhibit 19 you go on to say, "We are not talking about
13  months of delay here, period.  We are not even talking
14  about thirty days, period.  We're talking about one,
15  hyphen, four weeks max with all legal paperwork ready
16  for your signature, open parens, to accept the
17  principal back at signing and select how to received
18  the profits, close paren, period.  I think you'll be
19  very happy for the options you will be getting in front
20  of you at that time, period."  Do you see that?
21     A    I do.
22     Q    And in this paragraph, you're suggesting
23  that Ms. Hood was about to receive back her principal,
24  plus the profits, right?
25     A    I'm taking the Fifth.

30

1      Q    And to pay profits on the investment, your
2  business needed to have several million dollar in
3  sales, right?
4      A    I'm taking the Fifth.
5      Q    So if we go back to Exhibit 16, which I'm
6  now showing to you on the screen, do you see there the
7  first page of Exhibit 16?
8      A    Uh-huh.  Yes.
9      Q    And the purchase schedule lays out the
10  terms on which profits will be paid on Ms. Hood's
11  principal investment, right?
12     A    Yes.
13     Q    And in the second bullet point, the
14  company agreed to return to the note holder, meaning
15  Ms. Hood, an additional amount equal to the
16  contribution when it had reached total realized payment
17  receipt sales equal or more, but not less than
18  seven million, five hundred thousand dollars, right?
19     A    Right.
20     Q    How was Navis going to generate
21  seven million dollars in sales in one to four weeks in
22  July 2017?
23     A    I'm taking the Fifth.
24     Q    You did not pay Ms. Hood her principal or
25  any profits in August of 2017; isn't that correct?

31

1      A    I'm taking the Fifth.
2      Q    And in September of 2017, you received one
3  hundred and eighty thousand dollars from Evangelos
4  Marinakis; isn't that right?
5      A    I'm taking the Fifth.
6      Q    And according to your investigation
7  testimony, Mr. Marinakis agreed to pay you this money
8  to help him purchase two to four shipping vessels,
9  right?
10     A    I'm taking the Fifth.
11     Q    Okay.
12         (SEC Exhibit 20 was marked for
13         identification.)
14  BY MR. HARPER:
15     Q    I'm showing you now what has been marked
16  as Exhibit 20.  Do you see that before you on the
17  screen?
18     A    That's correct.
19     Q    All right.
20         And this is a Bank of America bank account
21  statement for Navis Ventures checking account, right?
22     A    That's correct.
23     Q    And you were shown a copy of this -- I'm
24  just going to orient you a little bit.  You were shown
25  a copy of this bank statement during your investigation

32

1 testimony, and it was marked there as Exhibit 6. Do
2 you see the white sticker at the bottom of the first
3 page of Exhibit 20?
4     A    Yes, I do.
5     Q    That's the investigation exhibit number,
6 but for today, I've marked it at your deposition as
7 Exhibit 20, which is the yellow sticker at the top.
8 Okay?  Sorry, you can't say uh-huh.  Do you understand
9 what I said?
10    A    I listened to you, yes.
11    Q    Okay.
12         So if we look at the account summary on
13 the first page, it appears that the beginning balance
14 for this account on September 1st, 2017 was fourteen
15 dollars and thirty-eight cents.  Do you see that?
16    A    Yes, I do.
17    Q    That was not enough money to pay
18 Ms. Hood's five thousand dollar principal investment,
19 right?
20    A    I'm taking the Fifth.
21    Q    And if we turn to page three of
22 Exhibit 20, which I'm now showing you on the screen, we
23 see the deposits and other credits for this account,
24 right?
25    A    Yes.

33

1     A    I'm taking the Fifth.
2     Q    And you used this one hundred and eighty
3 thousand dollars to pay Ms. Hood her five thousand
4 dollars principal, right?
5     A    I'm taking the Fifth.
6     Q    The online transfer of money from Ms. Hood
7 shows up in the withdrawal or other debits of page
8 three of Exhibit 20, dated September 6th, 2017, right,
9 five thousand dollars?
10    A    Yes.
11    Q    And you also used this money to pay
12 Mr. Torres his five thousand dollar principal
13 investment?
14    A    I'm taking the Fifth.
15    Q    And the transfer for him appears in the
16 same section of this statement, dated September 5th,
17 2017, right?
18    A    I'm taking the Fifth.
19    Q    And you also used this money to pay
20 Mr. Orne, spelled O-R-N-E, his ten thousand dollar
21 principal investment, right?
22    A    I'm taking the Fifth.
23    Q    And the payment is shown on the same bank
24 statement, dated September 8th, 2017, right?
25    A    I'm taking the Fifth.

35

1     Q    And there was a deposit -- a wire deposit
2 on September 1st, 2017 of a hundred and eighty thousand
3 dollars from Seawind Management, and this was the one
4 hundred and eighty thousand dollar wire transfer from
5 Mr. Marinakis, right?
6     A    I'm taking the Fifth.
7          Could you hold just a moment?  Can I have
8 one second, please?
9     Q    Absolutely.
10         MR. HARPER:  Brigitte, why don't we just
11 go off the record, and then we'll go back on when he
12 comes back.
13         (Whereupon, at 9:43 a.m., a short recess
14         was taken.)
15 BY MR. HARPER:
16    Q    All right.  Are you ready to proceed?
17    A    Yes.  Yes.
18    Q    Okay.
19         MR. HARPER:  Brigitte, could you read
20 back the last question.
21         (Whereupon, the Court Reporter read back
22         the question.)
23 BY MR. HARPER:
24    Q    Seawind Management was Mr. Marinakis's
25 business, correct?

34

1     Q    Did you also sell a 38 Ventures investment
2 to an individual named Chester Jakubowski?
3     A    I'm taking the Fifth.
4     Q    How did you come to know Mr. Jakubowski?
5     A    I'm taking the Fifth.
6     Q    Why did you ask him to invest in 38
7 Ventures?
8     A    I'm taking the Fifth.
9     Q    He, in fact, invested ten thousand dollars
10 in 38 Ventures, correct?
11    A    I'm taking the Fifth.
12    Q    And he made the same type of investment
13 that Jane Hood made; isn't that correct?
14    A    I'm taking the Fifth.
15         (SEC Exhibit 16A was marked for
16         identification.)
17 BY MR. HARPER:
18    Q    I'm showing you now what's been marked as
19 Exhibit 16A.  Do you have that before you on the
20 screen?
21    A    Yes, I do.
22    Q    Okay.
23         And do you see that Exhibit 16A is a copy
24 of Mr. Jakubowski's investment contract to invest ten
25 thousand dollars in 38 Ventures?

36

**Page 37**

1   A    I'm taking the Fifth.
2   Q    And if we go to page three of Exhibit 16A,
3  do you see the signature that's above 38 Ventures, LLC?
4   A    I'm taking the Fifth.
5   Q    And is that your signature?
6   A    I'm taking the Fifth.
7   Q    And after you signed this agreement,
8  Mr. Jakubowski paid you ten thousand dollars as his
9  investment in 38 Ventures, correct?
10   A    I'm taking the Fifth, and I correct
11  question.  The question is not right.  I'm taking the
12  Fifth.
13   Q    What do you mean when you say the question
14  is not right?
15   A    The question has an assumption.  You can
16  cannot make an assumption.  You make a statement.  The
17  question cannot be answered.  So I'm taking the Fifth.
18   Q    Why not?  I understand, but I don't
19  understand what you mean when you say that the question
20  has an assumption that's not correct.
21   A    You're -- it's a question, but it's not a
22  question statement.  And you're asking me to answer it,
23  so I'm taking the Fifth.
24   Q    Okay.
25        After you signed this investment contract,

**Page 38**

1  Chester Jakubowski paid ten thousand dollars to invest
2  in 38 Ventures?
3   A    I'm taking the Fifth.
4   Q    In return for Mr. Jakubowski's ten
5  thousand dollar investment, he would receive his
6  principal investment, plus fifteen percent interest,
7  plus an investment return of up to two times his
8  contribution amount of ten thousand dollars; is that
9  right?
10   A    I'm taking the Fifth.
11   Q    Okay.
12        As reflected in this contract,
13  Mr. Jakubowski's main objective in investing in 38
14  Ventures was to fund the business so that it could be
15  profitable and pay him the collateral benefit of an
16  investment return?
17   A    I'm taking the Fifth.
18   Q    The amount of his investment return
19  depended on the success of 38 Ventures as a business?
20   A    I'm taking the Fifth.
21   Q    And the amount of his investment return
22  increased if 38 Ventures was able to generate sales
23  revenue from deal making?
24   A    I'm taking the Fifth.
25   Q    And Mr. Jakubowski's expectation of any

**Page 39**

1  profits was dependent on your entrepreneurial efforts?
2   A    I'm taking the Fifth.
3   Q    Mr. Jakubowski was not part of 38
4  Ventures' management or operations?
5   A    I'm taking the Fifth.
6   Q    The investment contract called for
7  Mr. Jakubowski to be paid his principal back in
8  February 2016, correct?
9   A    I'm taking the Fifth.
10   Q    But Mr. Jakubowski was not paid his ten
11  thousand dollars principal investment in February 2016?
12   A    I'm taking the Fifth.
13   Q    Why was Mr. Jakubowski not ever paid back
14  for his ten thousand dollar investment?
15   A    I'm taking the Fifth.
16   Q    Why didn't you use some of the one hundred
17  and eighty thousand dollars you received from
18  Mr. Marinakis to pay back Mr. Jakubowski?
19   A    I'm taking the Fifth.
20   Q    Have any of your investment businesses, 38
21  Ventures, Navis Ventures, Noah Capital, Pevadi
22  Brothers, Black Falcon, have any of them paid
23  Mr. Jakubowski back his ten thousand dollar principal
24  investment?
25   A    I'm taking the Fifth.

**Page 40**

1   Q    Have you or anyone else paid
2  Mr. Jakubowski ten thousand dollars to reimburse him
3  for his investment loss?
4   A    I'm taking the Fifth.
5   Q    All right.  I'd now like to ask you some
6  questions about Navis Ventures.  Okay?
7        Okay, Mr. Trikantzopoulos?
8   A    Yes.  Yes.
9   Q    Okay.
10        In 2018, you solicited Constantine Antonas
11  to invest in Navis; is that right?
12   A    I'm taking the Fifth.
13   Q    The amount of his investment return
14  depended on the success of Navis as a business?
15   A    I'm taking the Fifth.
16   Q    And the amount of Mr. Antonas's investment
17  return would increase the more Navis was able to be
18  successful in deal making?
19   A    I'm taking the Fifth.
20   Q    And Mr. Antonas's expectation of any
21  profits was dependent on your entrepreneurial efforts?
22   A    I'm taking the Fifth.
23   Q    Mr. Antonas was not part of the Navis's
24  management or operations?
25   A    That's correct.

```
 1        (SEC Exhibit 21 was marked for
 2        identification.)
 3  BY MR. HARPER:
 4     Q    I'm now showing you what's been marked as
 5  Exhibit 21.  Do you see that's it's an Email from you
 6  to Constantine Antonas, dated June 12th, 2018?
 7     A    Uh-huh.  Correct.
 8     Q    And in the Email, you say that you met
 9  Mr. Antonas in Miami at a Wilson conference where you
10  were a panelist.  Do you see that?
11     A    I'm taking the Fifth.
12     Q    What is a Wilson conference?
13     A    I'm taking the Fifth.
14     Q    At the Miami conference in 2015, what was
15  the topic of the panel you served on?
16     A    I'm taking the Fifth.
17     Q    What did you talk about?
18     A    I'm taking the Fifth.
19     Q    From 2015 to 2018, how many of these types
20  of conferences did you serve on as a panelist?
21     A    I'm taking the Fifth.
22     Q    Where were these conferences held?
23     A    I'm taking the Fifth.
24     Q    What other topics did you talk about as a
25  panelist?
```

41

```
 1     A    I'm taking the Fifth.
 2     Q    How many conferences did you attend,
 3  whether as a panelist or as attendee?
 4     A    During what period?
 5     Q    From 2015 to 2018.
 6     A    I'm taking the Fifth.
 7     Q    Do you intend to assert the Fifth
 8  Amendment privilege against self-incrimination
 9  concerning all questions about your attendance at
10  investor or family office conferences?
11     A    For this deposition, yes.
12     Q    Going back to the Miami conference, what
13  are the reefers that you and Mr. Antonas talked about
14  investing in?
15     A    I'm taking the Fifth.
16        MR. HARPER:  All right.  So Mr. Antonas,
17  we've been going -- oh, sorry.  Mr. Trikantzopoulos,
18  we've been going now for about an hour, and we're
19  moving along pretty well.  I'd say -- let's go off
20  the record for a minute.
21        (Whereupon, at 9:55 a.m., a short recess
22        was taken.)
23        MR. HARPER:  Let's go back on the
24  record.
25
```

42

```
 1  BY MR. HARPER:
 2     Q    Mr. Trikantzopoulos, before we started the
 3  deposition, you had told me and David London and the
 4  other representative from the SEC on this call that you
 5  intended to assert the privilege against
 6  self-incrimination, right?
 7     A    That's correct.  Yes.
 8     Q    Yes.
 9        And so since the beginning of this
10  deposition, you've been asserting the Fifth Amendment,
11  right?
12     A    Most of the time.
13     Q    Okay.
14        So I just want to state for the record
15  that I do not have the authority to compel your
16  testimony by giving you immunity from prosecution, and
17  any question that I'm asking is with the understanding
18  that if you wish to assert your privilege, you need
19  merely state that you refuse to answer on the grounds
20  that your answer might incriminating you, which you've
21  been doing by saying the Fifth.  Okay?
22     A    Mr. Harper, to be absolute direct and
23  sincere with you, okay, I'm not a hundred percent sure
24  the implications of using the Fifth.  I wish I could as
25  much as humanly possible explain by answering the
```

43

```
 1  questions you have been asking; however, again, because
 2  of my experience with the first deposition and because
 3  I don't have the privilege currently to have legal
 4  advice, I'm in a disadvantage position, and my only, I
 5  would say, option left on the table from the options I
 6  think I have, and I'm not a lawyer, I'm not an expert
 7  in your job, I have taken that decision based on what I
 8  think might be more appropriate under the
 9  circumstances.  It has nothing to do with -- the
10  phrasing that you legally use, it's a little bit for me
11  a lot of indirect suggestions, but I don't think I have
12  a choice.  That's what I would like to state.
13        It has nothing to do with the conditions
14  of this deposition.  It is simply because I don't have
15  the training by a lawyer or the pleasure of a lawyer to
16  assist me, and I don't think I have another choice.  I
17  don't think that I have the choice to answer this in a
18  way that I would protect my interest in the future.
19  And this is -- again, we're off the record, but this is
20  best for I'm sure everybody because it's very, very
21  important a thing for me.
22     Q    No.  We're actually on the record.  I just
23  want to make sure that you and I are clear on --
24     A    Oh, okay.
25     Q    -- what the understanding is, and it
```

44

1  sounds like you understand -- it sounds like you
2  understand that you are not compelled to answer any
3  questions if you believe that a truthful answer to the
4  question might show that you committed a crime, and if
5  you wish, you may assert your privilege against
6  self-incrimination.
7      A    I'm asserting my privilege for different
8  reasons. I'm not exactly agreeing with the statement
9  you have made. I'm not refusing to answer necessarily
10 because I have done something wrong with this man. I
11 refuse to answer a question because I think from my
12 previous experience things have turn a completely -- in
13 a very surprising way, which I was suddenly confronted
14 with. So based on that, because I don't think I have a
15 choice. Again, listen, I'm not a lawyer, and I'm just
16 saying I'm referring to answer further questions
17 because I think at this stage for different reasons and
18 different understanding that I have is the best course
19 of action I have. That's all -- the statement that I'm
20 making.
21     Q    Okay.
22         And just you should be aware that if you
23 refuse to answer questions based on your Fifth
24 Amendment privilege against self-incrimination, it's
25 focused on that particular right, and only you can

45

1  decide whether it's appropriate or not, but when you
2  assert the privilege against self-incrimination, a
3  judge or a jury may take an inference later against you
4  in a civil action. And what that means is, the judge
5  or the jury would be permitted to infer that your
6  answers to the questions that you didn't give might
7  incriminate you.
8      A    Again, Mr. Harper, I don't have an
9  independent lawyer, a lawyer to explain to me in full
10 what my own interest about this, so I'm at a
11 disadvantage and that while I think I'm following, I do
12 realize it's a very complicated matter and even the
13 simple statement you might be extremely familiar
14 because of your life as an attorney, but I am facing
15 for the first time in my life. I'm not twenty years
16 old to read books and investigate this. I do not have
17 the privilege at this stage to have the necessary
18 advice to proceed. And I don't know how else to
19 explain that. I'm standing with this refusing to
20 answer. The way you phrase it, unfortunately, is not
21 the way that I am -- I would agree, per se, but again,
22 because I don't have -- I'm making a choice based on
23 extremely limited information that I have, information
24 that would have been more appropriate to make full
25 decisions if I had legal assistance. I don't have

46

1  this, so I'm forced to do that. It's a forced
2  decision. You cannot direct me differently.
3      Q    Yes, you're correct that I cannot direct
4  you to do anything. The choice to assert the privilege
5  against self-incrimination is your own. I just wanted
6  to make sure that you were aware of the potential
7  consequence of asserting it. So now that --
8      A    Actually, Mr. Harper, you cannot state
9  that. I'm not aware. To suggest to an individual like
10 myself that they should be aware about a complicated
11 legal status because of a statement because of a law
12 situation when I don't have -- that's why people have
13 lawyers. I don't have a lawyer currently to assist me.
14         So the statement that you make that I am
15 fully aware of the consequence, it's not that I'm
16 aware. As a human being, as a person, based on my
17 understanding, on my knowledge, and the expense that I
18 have in front of the legalities of such an important
19 procedure limit me to my ability, but I cannot but take
20 this decision. That's all.
21     Q    Okay.
22         I've given you, I think, is the
23 appropriate disclosure, and we'll continue now.
24     A    Thank you. I appreciate it. Thank you.
25     Q    Yes.

47

1          All right. So before we took a break, I
2  was showing you what had been marked as Exhibit 21,
3  which is this Email from you to Mr. Antonas on
4  June 12th, 2018. Do you have it before you?
5      A    I do.
6      Q    Okay.
7          And after you sent this Email, in about
8  two weeks you had gotten Mr. Antonas to invest two
9  hundred and fifty thousand dollars in Navis Ventures,
10 right?
11     A    I'm taking the Fifth.
12         (SEC Exhibit 22 was marked for
13         identification.)
14 BY MR. HARPER:
15     Q    I'm now showing you what has been marked
16 as Exhibit 22, which is an Email from you to
17 Mr. Antonas, dated June 27th, 2018. Do you see it?
18     A    I do.
19     Q    And this is about fifteen days after the
20 follow-up Email to Mr. Antonas that we just looked at
21 that was marked as Exhibit 21, right?
22     A    I'm taking the Fifth.
23     Q    And in the Email that's marked as
24 Exhibit 22 you say you received Mr. Antonas's
25 investment of two hundred and fifty thousand dollars?

48

1    A    I'm taking the Fifth.

2    Q    And between June 12th, your Email that was
3 marked as Exhibit 21, and June 27th, when you
4 returned -- or excuse me, you confirmed receiving
5 Mr. Antonas's investment, you negotiated the investment
6 with Mr. Antonas, right?

7    A    I'm taking the Fifth.

8    Q    And as part of those negotiations, you
9 made representations to him about the investment?

10    A    I'm taking the Fifth.

11    (SEC Exhibit 23 was marked for
12    identification.)

13 BY MR. HARPER:

14    Q    So I'm now showing you what's been marked
15 as Exhibit 23, which contains an Email from you to
16 Mr. Antonas that's dated June 14th, 2018, right?

17    A    I'm taking the Fifth.

18    Q    And this is two days after your first
19 Email to Mr. Antonas that we looked at that was marked
20 as Exhibit 21?

21    A    I'm taking the Fifth.

22    Q    And in the Email that's marked as Exhibit
23 23, you provide some details on possible investments
24 that could be made by Mr. Antonas?

25    A    I'm taking the Fifth.

49

1    Q    And on the first page of the Email, do you
2 see the fifth paragraph that starts, "If you thing your
3 fund can commit a guarantee or cash from a minimum of
4 two hundred and fifty thousand dollars to nine hundred
5 thousand dollars, then this is what you get, colon."
6 Do you see that?

7    A    I'm taking the Fifth.

8    Q    And if we look underneath that sentence
9 and go to the next page, there are three bullet points.
10 Do you see those?

11    A    I'm taking the Fifth.

12    Q    And the third bullet point starts, If you
13 use cash?

14    A    Is there a question?

15    Q    Yes.

16    A    What's the question?

17    Q    Yes.

18    A    I'm taking the Fifth.

19    Q    Okay.

20    In that third bullet you say, if
21 Mr. Antonas uses cash, then he will get, quote, An
22 amount three times the principal within six months
23 subject to the successful purchase the Korean company,
24 close quote," right?

25    A    I'm taking the Fifth.

50

1    Q    And the Korean company was a company
2 called SeokJung, spelled S-E-O-K-J-U-N-G; is that
3 right, Mr. Trikantzopoulos?

4    A    I'm taking the Fifth.

5    Q    And in that same third bullet point, you
6 say, "In theory, you can combine the two options,"
7 right?

8    A    I'm taking the Fifth.

9    Q    And the two options are guarantee or cash?

10    A    I'm taking the Fifth.

11    Q    And then the next sentence you say, "In
12 both cases, your principal is secured by our future
13 profit sharing and fees," right?

14    A    I'm taking the Fifth.

15    Q    But Navis Ventures never had any profit
16 sharing or fees, right?

17    A    I'm taking the Fifth.

18    Q    It didn't have profit sharing or fees
19 prior to June 2018?

20    A    I'm taking the Fifth.

21    Q    It didn't have them in June of 2018?

22    A    I'm taking the Fifth.

23    Q    And it didn't have them -- it didn't have
24 profit sharing or fees after June of 2018?

25    A    I'm taking the Fifth.

51

1    Q    And then in the next paragraph that
2 follows the three bullet points, the first sentence
3 says, "The above has very low risk, comma, if any,"
4 right?

5    A    I'm taking the Fifth.

6    Q    Prior to receiving Mr. Antonas's two
7 hundred and fifty thousand dollar investment, Navis's
8 bank account had a negative balance, right?

9    A    I'm taking the Fifth.

10    (SEC Exhibit 24 was marked for
11    identification.)

12 BY MR. HARPER:

13    Q    I'm showing you now what's been marked as
14 Exhibit 24.

15    A    I'm taking the Fifth.

16    Q    Do you see that this is a bank account
17 statement for Navis Ventures, dated June 2018?

18    A    I'm taking the Fifth.

19    Q    And do you see that according to the first
20 page of the statement, as of January 1st, 2018, this
21 account had a negative balance of seven hundred and
22 nineteen dollars?

23    A    I'm taking the Fifth.

24    Q    This means the account was overdrawn by
25 seven hundred and nineteen dollars?

52

1    **A**    I'm taking the Fifth.
2    **Q**    And if we go to the third page of this
3    account statement that's marked as Exhibit 24, we see
4    that there was only one deposit or other credit in the
5    month of June 2018, right?
6    **A**    I'm taking the Fifth.
7    **Q**    And the deposit was on June 27th, 2018 in
8    the amount of two hundred and fifty thousand dollars
9    from Epitome Investment Fund, right?
10    **A**    I'm taking the Fifth.
11    **Q**    And this is Mr. Antonas's investment fund
12    that invested two hundred and fifty thousand dollars
13    after negotiating with you?
14    **A**    I'm taking the Fifth.
15    **Q**    So from June 1st to June 26th, 2018, the
16    Navis Ventures bank account was overdrawn by about
17    seven hundred and nineteen dollars, right?
18    **A**    I'm taking the Fifth.
19    **Q**    So for the entire time you were
20    negotiating with Mr. Antonas, Navis's bank account was
21    negative?
22    **A**    I'm taking the Fifth.
23    **Q**    In fact, when you Emailed Mr. Antonas on
24    June 12th, 2018 to follow-up from the Wilson
25    conference, the Navis bank account was a negative

53

1    balance?
2    **A**    I'm taking the Fifth.
3    **Q**    And during that same month --
4    **A**    Mr. Harper, can you repeat the question by
5    the way again, your last question?
6    **Q**    Sure.
7          When you Emailed Mr. Antonas on June 12th,
8    2018 to follow-up for the Wilson conference, Navis
9    management's bank account had a negative balance?
10    **A**    The beginning of the question says what,
11    when I did what?
12    **Q**    When you Emailed Mr. Antonas, so I'll go
13    back --
14    **A**    Yes.
15    **Q**    I'm showing you now Exhibit 21.  You
16    Emailed Mr. Antonas on June 12th, 2018 as a follow-up
17    for the Wilson conference, right?
18    **A**    Okay.  Yes.  Yes.
19    **Q**    And you were following up after meeting
20    him in December of 2015, right?
21    **A**    Okay.  I understand the question.  Yeah.
22          I'm taking the Fifth.
23    **Q**    All right.  So let me ask it again.  When
24    you sent the Email that's been marked as Exhibit 21
25    that's in front of you now, Navis management's bank

54

1    account was in a negative balance?
2    **A**    I'm taking the Fifth.
3    **Q**    And in June of 2018 --
4    **A**    Hello?
5    **Q**    Yep.  Sorry.  I'm going to rephrase this
6    question.
7          (SEC Exhibit 26 was marked for
8          identification.)
9    BY MR. HARPER:
10    **Q**    All right.  I'm going to show you what's
11    been marked as Exhibit 26.  Do you have Exhibit 26
12    before you?
13    **A**    Yes, I do.
14    **Q**    And is Exhibit 26 a copy of your corporate
15    checking account at Bank of America that you share with
16    your wife, Elena Catizone?
17    **A**    That's correct, that's a joint account.
18    **Q**    And this is the account statement for the
19    month period of May 30th, 2018 to June 27th, 2018?
20    **A**    I'm taking the Fifth.
21    **Q**    And as shown on the first page of this
22    exhibit, as of May 30th, 2018, this account held
23    twenty-six dollars and eighty-five cents, right?
24    **A**    I'm taking the Fifth.
25    **Q**    And in that same account summary, it shows

55

1    that during that month period, there were deposits and
2    other additions of twelve thousand, three hundred and
3    sixty-three dollars, right?
4    **A**    I'm taking the Fifth.
5    **Q**    If we go to page three -- if we go to page
6    three of this exhibit, we see the section that shows
7    the detail of the deposits and other additions, right?
8    Do you see that on your screen?
9    **A**    I'm taking the Fifth.
10    **Q**    And I just want to scroll down to page
11    four.  Do you see the section continues on to halfway
12    through page four?
13    **A**    I'm taking the Fifth.
14    **Q**    And if we look at the bottom of this
15    section, we see that there's a nine thousand dollar
16    transfer on June 27th, 2018 of nine thousand dollars
17    from Navis Ventures.  Do you see that?
18    **A**    I'm taking the Fifth.
19    **Q**    This is the same day that Mr. Antonas
20    wired the two hundred and fifty thousand dollar
21    investment in Navis from his investment company, right?
22    **A**    I'm taking the Fifth.
23    **Q**    And we just saw that until June 27th, that
24    the Navis account had had a negative balance, right?
25    **A**    I'm taking the Fifth.

56

**Page 57**

1  Q    So on June 27th, when Navis wired that two
2  hundred and fifty thousand dollars, you transferred
3  nine thousand to fund your personal checking account,
4  right?
5  A    I'm taking the Fifth.
6  Q    And if we go down to the next section of
7  this bank account statement on page four, it shows the
8  withdrawals and other subtractions?
9  A    I'm taking the Fifth.
10  Q    And in this section, there are charges to
11  Trader Joe's and Roche Brothers and Whole Foods, right?
12  A    I'm taking the Fifth.
13  Q    These are grocery stores?
14  A    I'm taking the Fifth.
15  Q    And there are also charges for Starbucks
16  and Apple iTunes?
17  A    I'm taking the Fifth.
18  Q    These are all charges that were made to
19  your personal bank account that were personal expenses
20  for you and your wife, right?
21  A    I'm taking the Fifth.
22  Q    And if we go back up to the section of
23  deposits and other additions that's on page three of
24  Exhibit 26, we see that from June 4th through June
25  21st, there are a series of deposits from Lyft. Do you

**Page 58**

1  see those?
2  A    I'm taking the Fifth.
3  Q    Lyft is a ride sharing company, right?
4  A    I'm taking the Fifth.
5  Q    And you can earn money by signing up to
6  drive people who use the Lyft app?
7  A    I'm taking the Fifth.
8  Q    And on June 2018, you were making ends
9  meet by being a Lyft driver, right?
10  A    I'm taking the Fifth.
11  Q    When did you start driving for Lyft?
12  A    I'm taking the Fifth.
13  Q    How long did you make money by being Lyft
14  driver?
15  A    I'm taking the Fifth.
16  Q    From 2015 through 2018, what other jobs
17  did you hold to make ends meet for your family?
18  A    I'm taking the Fifth.
19  Q    Do you intend to assert the privilege
20  against self-incrimination concerning all questions
21  about the use of Mr. Antonas's two hundred and fifty
22  thousand dollar investment?
23  A    That's correct.
24  Q    And do you intend to assert a privilege
25  against self-incrimination concerning all questions

**Page 59**

1  about whether the use of that money was for personal
2  expenses?
3  A    Yes, I do.
4  Q    And do you intend to assert the privilege
5  against self-incrimination concerning all questions
6  about your other forms of employment?
7  A    That's correct.
8       (SEC Exhibit 27 was marked for
9       identification.)
10  BY MR. HARPER:
11  Q    All right. I'm now going to show you
12  what's been marked as Exhibit 27. Do you have Exhibit
13  27 before you?
14  A    Yes, I do.
15  Q    And do you see that it's an Email from you
16  to Mr. Antonas, dated June 17th, 2018?
17  A    I'm taking the Fifth.
18  Q    Okay.
19       And this is about ten days before
20  Mr. Antonas wires you the two hundred and fifty
21  thousand dollar investment in Navis Ventures, right?
22  A    I'm taking the Fifth.
23  Q    And at the time you sent this Email,
24  Navis's bank account had a negative balance, right?
25  A    I'm taking the Fifth.

**Page 60**

1  Q    And your personal checking account had
2  less than a thousand dollars in it?
3  A    My personal checking account?
4  Q    Yes.
5  A    In the Bank of America, yes.
6  Q    I'm sorry. I didn't catch that last
7  piece.
8  A    You're asking about my personal checking
9  account in Bank of America, correct?
10  Q    Yes.
11  A    Okay. Your question was about the amount,
12  correct, in the account?
13  Q    Yes. As of the time you sent this Email,
14  June 17th, 2018, you had less than a thousand dollars
15  in your personal bank account, your personal checking
16  account? I can show it to you again. You want to see
17  it again?
18  A    You're talking about the Bank of America,
19  the one you've been showing? I understand. I'm taking
20  the Fifth.
21  Q    Okay.
22       And as of the time that you sent this
23  Email on June 17th, 2018, you were working as a Lyft
24  driver to make ends meet financially, right?
25  A    I'm taking the Fifth.

1    Q    And on the second page of this Email to
2  Mr. Antonas on paragraph five you described two
3  investment options, right?
4    A    I'm taking the Fifth.
5    Q    And the first option is a cash
6  contribution?
7    A    I'm taking the Fifth.
8    Q    And for that option you say, quote, To be
9  used as working capital. Will result in three X of the
10  principal return, comma, subject to the acquisition of
11  the Korean company, period, right?
12    A    I'm taking the Fifth.
13    Q    And then in paragraph six, you say, "For
14  any contribution based on Section 5.1, cash proceeds
15  cover working capital to attract and retain new clients
16  and for any expenses related to the Korean acquisition,
17  period," right?
18    A    I'm taking the Fifth.
19    Q    This Email doesn't mention that Navis's
20  operating account at Bank of America has a negative
21  balance?
22    A    I'm taking the Fifth.
23    Q    It doesn't mention that you need this
24  money to pay your personal expenses?
25        Mr. Trikantzopoulos, this Email doesn't

61

1  understand what you're saying. Okay? But the question
2  in your phrasing that's a yes or a no in a capacity
3  that puts me in a very difficult spot.
4    Q    Well, Mr. Trikantzopoulos, in the Email to
5  Mr. Antonas that we're looking at in Exhibit 27, you
6  say that the investment made by Mr. Antonas will be
7  used for working capital, right?
8    A    Mr. Harper, these are statements that are
9  evident from the information you have in front of you.
10    Q    All right.
11        And we also looked at the bank account for
12  Navis that showed that it had a negative balance at the
13  beginning of June, but as soon as the money came in,
14  you transferred nine thousand dollars of it to your
15  personal checking account that you share with your
16  wife, right?
17    A    That's correct.
18    Q    And you spent that money on personal
19  expenses?
20    A    It's evident what you see in the paper,
21  Mr. Harper, yes.
22    Q    All right.
23        And in this communication that you sent to
24  Mr. Antonas on the 27th didn't say that you were going
25  to use this money to pay your personal expenses, right?

63

1  mention that you need this money to pay your personal
2  expenses, right? Can you hear me?
3    A    I can hear you. I can hear you.
4    Q    Do you need me to read the question again?
5    A    No. No. I heard the question. I --
6  it's -- it's -- I'm taking the Fifth.
7    Q    That's your answer, you're taking the
8  Fifth?
9    A    Uh-huh.
10    Q    Sorry. You can't mumble. You're
11  asserting the Fifth to the question?
12    A    Yes, I'm asserting the Fifth on the
13  question because of -- yes.
14    Q    I'll read it again. I'll read it again.
15        This Email doesn't mention that you need
16  this money to pay your personal expenses?
17    A    Mr. Harper, the question is phrased in a
18  very suggestive way, and that I am -- I'm having
19  difficulty figuring out how to answer it, and I'm going
20  back to the statements. I think this is a question
21  that is not -- too many interpretation from my point of
22  view, so I'm --
23    Q    So let me --
24    A    You're restricted that in a very, very
25  narrow point of view, and I object to that. I

62

1    A    In the communication that I had with
2  Mr. Antonas, there are many things that are not being
3  said. The communication is as you see it. There are
4  many things that are not said. It doesn't mean
5  anything else. It means things that things are not
6  said. The communication is based on one or two pages.
7  Two pages can never describe twenty pages or fifty
8  pages.
9    Q    And we saw in the previous Email,
10  Exhibit 26, you describe to Mr. Antonas, described his
11  investment of two hundred and fifty as low risk, right?
12    A    I'm taking the Fifth.
13    Q    But we also saw that Navis had a negative
14  bank balance in its bank account at the same time you
15  sent that Email, right?
16    A    Mr. Harper, you're trying to create a --
17  you're building up a story here, and I do not -- the
18  story's highly misleading. From what you say, it's
19  misleading. So you can say --
20    Q    Mr. Trikantzopoulos --
21    A    -- but what you have in front of you is
22  not -- it's limited to what you have in front of you.
23    Q    So the purpose of the deposition is for
24  the SEC to have the opportunity to show you the
25  evidence that it has, right, and to ask some questions

64

1 about, and that's what we're doing.
2     A     That's correct.
3     Q     If you feel like it's unfair, you
4 should -- if you believe you want to you, can explain
5 it, right, you can explain it, or you can take the
6 Fifth, either way, but you can't sit there and refuse
7 to provide substantive answers and then call it unfair.
8 Your choices are:  You can testify and respond to the
9 questions, or you can assert the Fifth as you've been
10 doing.  It's up to you.  It is up to you.
11     A     With all due respect, Mr. Harper, you're
12 ignoring the basic fact that I don't have currently the
13 privilege of legal advice, I'm at a disadvantage.  So
14 the suggestion that I have choice is absolutely
15 inaccurate, absolutely inaccurate.  It is highly,
16 highly inappropriate to suggest that we are at this
17 stage on -- you're not discussing this with me as an
18 adult.  You're discussing as a heavy weight to an
19 infant.  So it is not -- a heavy weight cannot ask
20 questions to an infant and expect the infant to have
21 the ability to answer no matter how much the heavy
22 weight is going to explain, no matter how much.
23         So I am asserting that any answer that I
24 have given to you now, and I repeat the statement that
25 I made at the very first statement, Mr. Harper, is that

65

1 I don't have the luxury to expand because the
2 conversation in the Emirates might be recorded by a
3 foreign government, and I have several reasons to
4 believe that, several reasons to feel uncomfortable,
5 number one.
6         Number two, I told you that because I
7 don't have the legal training to be able to answer the
8 questions and because there are many circumstances that
9 I want to verify with a lawyer, I have chosen something
10 that I think is appropriate under the circumstances.
11 But to suggest that there is a fairness in the process
12 today, I can say whatever I want.  I can say it's
13 trash, whatever.  You can say whatever you want.  Now,
14 I understand you have to ask questions, but your
15 questions are designed to conclude, so they're not
16 questions to reveal.  They're designed to conclude.  So
17 I am just saying to you how I feel.  That's all.
18 Because it's not a feeling.  It's a fact.  I full agree
19 with you.  So I'm taking the Fifth based on what
20 statements I make just now.
21     Q     Okay.  That's fine.  You're free to assert
22 the Fifth, if you'd like.
23         Just to go kind of go back on the
24 procedure piece of this, you gave investigation
25 testimony concerning Ms. Hood's investment in 38

66

1 Ventures -- or the 38 Ventures investments that were
2 taken by you and Mr. Antonas's investment in Navis in
3 November of 2019.  And after that, the SEC sued you for
4 securities fraud in a complaint that was filed in the
5 United States District Court of Massachusetts in June
6 of 2020.  And since that time, you've actually been
7 represented by counsel at Burns & Levinson until
8 recently, until, I think, March when they withdrew.
9 You had notice of that withdrawal.  The court set a
10 deadline for you to get substitute counsel or proceed
11 pro se.  That deadline has passed, and so now you're
12 proceeding pro se.
13         So to say that you have not had
14 representation in this case or had a fair process with
15 notice to obtain counsel is actually incorrect, and so
16 I'm just going to note that for the record.  And then
17 we'll just --
18     A     Okay.  I can now respond to that.  It is,
19 again, officially based on a system that suggest that
20 the deadlines not considering all the circumstance.
21 Not only we don't have the ability for me to travel to
22 collect evidence that's absolutely necessary for this
23 case, but also other people had difficulty
24 communicating with me.  It put me in a very difficult
25 spot.  To suggest that the United States legal system

67

1 is proceeding according to normal on an international
2 case, you can call it -- you made a statement that is
3 based on what you think is fair.  What you think or
4 what your colleagues think is fair doesn't mean it's
5 fair to somebody else.  What is fair, you know, we're
6 not judging here if it's fair.
7         So as you call it, let's stay on the
8 facts.  I understand that the SEC has their
9 presentation.  I understand that the court decided to
10 give me a deadline.  I understand that, but it doesn't
11 change the fact that at this moment I don't have a
12 lawyer assisting me.  It does not change the fact, sir.
13 Okay?  So let's proceed to making sure that I have that
14 on record.
15     Q     Okay.
16         So let's continue then.
17         (SEC Exhibit 28 was marked for
18         identification.)
19 BY MR. HARPER:
20     Q     I'm showing you now what has been marked
21 as Exhibit 28.  Do you have it before you on your
22 screen?
23     A     I do.
24     Q     And do you see that it's an Email from you
25 to Mr. Antonas, dated June 21st, 2018?

68

1    **A**    I'm taking the Fifth.
2    **Q**    And this is about six days from
3  Mr. Antonas's wiring of two hundred and fifty thousand
4  dollars to Navis for his investment?
5    **A**    I'm taking the Fifth.
6    **Q**    And in the first paragraph of the Email,
7  you say you're sending Mr. Antonas an agreement through
8  dochub.com that he can sign electronically?
9    **A**    I'm taking the Fifth.
10    **Q**    And then you say, quote, Personally,
11  comma, I really would like to have you on board, comma,
12  however, this might become a challenge as our
13  executives are in talks with four hedge funds, period.
14  We will have to go with the one that will be voted for
15  and will commit first, period."  Do you see that?
16    **A**    I'm taking the Fifth.
17    **Q**    Who were the Navis executives in talks
18  with the four hedge funds?
19    **A**    I'm taking the Fifth.
20    **Q**    And what were the names of the four hedge
21  funds?
22    **A**    I'm taking the Fifth.
23    **Q**    Did you negotiate with any of the hedge
24  funds that you mention in this Email?
25        Do you need me to read the question again?

69

1  commit first, period."  Do you see that?
2    **A**    I'm taking the Fifth.
3    **Q**    Who was going to vote?
4    **A**    I'm taking the Fifth.
5    **Q**    And vote for what?
6    **A**    I'm taking the Fifth.
7    **Q**    Okay.  So are you going to assert the
8  Fifth Amendment privilege against self-incrimination
9  concerning the process for these alternative investors?
10    **A**    Mr. Harper, I'm going to be using Fifth
11  Amendment continuously.
12    **Q**    Okay.
13        (SEC Exhibit 28A was marked for
14        identification.)
15  BY MR. HARPER:
16    **Q**    All right.  So I'm going to show you now
17  what's been marked as Exhibit 28A.  Do you see on
18  Exhibit 28A there's an Email from you to Mr. Antonas,
19  dated June 25th, 2018, the subject of the Email being,
20  Sponsor?
21    **A**    I'm taking the Fifth.
22    **Q**    And June 25th is just two days before
23  Mr. Antonas wired the two hundred and fifty thousand
24  dollars for investment in Navis, right?
25    **A**    I'm taking the Fifth.

71

1    **A**    Your question was, if I negotiated with
2  the funds that I am referring to this specific Email,
3  correct?
4    **Q**    Yes.  You say in the Email, you say, Our
5  executives are in talks with four hedge funds.  My
6  question is:  Did you negotiate with any of the four
7  hedge funds that are mentioned here?
8    **A**    I don't recall.
9    **Q**    Okay.  So you're not taking the Fifth.
10        What were the names of the funds?
11    **A**    I'm taking the Fifth.
12    **Q**    Okay.
13        Who were the executives that did the
14  negotiating with the hedge funds?
15    **A**    I'm taking the Fifth.
16    **Q**    How much money were these hedge funds
17  going to invest?
18    **A**    I'm taking the Fifth.
19    **Q**    Are you going to assert the Fifth
20  Amendment privilege against self-incrimination
21  concerning the identity of the executives or the four
22  hedge funds that you have talked about in this Email?
23    **A**    Yes.
24    **Q**    Next in this Email, you say, "We will have
25  to go with the one that will be voted for and will

70

1    **Q**    And in this Email, you say, "Dear
2  Constantine, comma, I hope all is well, period.  I just
3  got off the conference call with my French partner and
4  I was told that one of the hedge funds in France is
5  also interested to participate."  Do you see that?
6    **A**    I'm taking the Fifth.
7    **Q**    Who was your French partner that you
8  referred to here?
9    **A**    I'm taking the Fifth.
10    **Q**    Was it Jean Francois Regnauld?
11    **A**    No.
12    **Q**    Who was it?
13    **A**    I'm taking the Fifth.
14    **Q**    So you answered one question
15  substantively.  Then you took the Fifth.  Are you going
16  to take the Fifth concerning all questions about the
17  identity of the French partner?
18    **A**    Yes.  Correct.
19    **Q**    What was the name of the hedge fund in
20  France?
21    **A**    I'm taking the Fifth.
22    **Q**    And who spoke with this hedge fund?
23    **A**    I'm taking the Fifth.
24    **Q**    Are you going to assert the Fifth
25  Amendment privilege against self-incrimination

72

1  concerning all questions about the identify of this
2  hedge fund in France and any communications with it?
3    **A**    Yes.
4    **Q**    And in the second sentence of your Email
5  you say, "Although Jean Francois knows about your
6  verbal commitment, without your signature and the
7  registration fee I cannot prevent Jean from moving
8  forward with his own proposition, period."  Do you see
9  that?
10   **A**    I'm taking the Fifth.
11   **Q**    Please explain why you could not prevent
12 Jean Francois from moving forward with a transaction
13 between a French hedge fund and Navis?
14   **A**    You want me to explain why someone just
15 doesn't do something?  Is that the question?
16   **Q**    The Email says, "I cannot really prevent
17 Jean from moving forward with his own proposition,"
18 right?
19   **A**    Right.
20   **Q**    So I want you to explain why you could not
21 prevent Jean Francois from moving forward with a
22 transaction between a French hedge fund on one hand and
23 Navis on the other?
24   **A**    And then I'm not following the question.
25 I cannot -- I cannot --

73

1    **Q**    The first line --
2    **A**    Yeah.  Go ahead.
3    **Q**    Sure.
4        The first clause says that although Jean
5  Francois knows about your verbal commitment, that means
6  Mr. Antonas's verbal commitment to make an investment
7  in Navis, right?
8    **A**    Well, it was three years ago.  I cannot
9  fully remember the context, but it says what it says.
10   **Q**    Well, when you're Emailing Mr. Constantine
11 on June 25th, 2018, you're talking about his potential
12 investment of two hundred and fifty thousand dollars in
13 Navis, right?
14   **A**    That sounds right.
15   **Q**    Okay.
16       And when you say, Although Jean knows
17 about your verbal commitment, you're talking about
18 Mr. Antonas's verbal commitment to invest two hundred
19 and fifty thousand dollars in Navis, right?
20   **A**    I'm taking the Fifth.
21   **Q**    And when you say, Without your signature,
22 you're talking about Mr. Antonas's signature, right?
23   **A**    I'm taking the Fifth.
24   **Q**    And when you say, Without your signature
25 and the registration fee, I cannot really prevent Jean

74

1  from moving forward with his own proposition, that
2  means that you're telling Mr. Antonas that until he
3  signs and pays the registration fee, he cannot prevent
4  Jean Francois -- or you cannot prevent Jean Francois
5  from engaging in the same transaction with a French
6  hedge fund?
7    **A**    I'm taking the Fifth.  I cannot answer
8  this question now, Mr. Harper.  Again, it's -- I really
9  don't understand the question.  I'm taking the Fifth
10 here.
11   **Q**    Sure.
12       I'll ask it more simply then.  In this
13 Email you're telling Mr. Antonas that he needs to sign
14 and make a commitment to paying the two hundred and
15 fifty thousand dollars; otherwise, the deal will be
16 taken by a French hedge fund that Jean Francois is
17 talking to?
18   **A**    I'm taking the Fifth.  Again, I'm not
19 going to keep repeating the whole process.  I am take
20 the Fifth because my concern if I explain and it's
21 a very simple explanation, you guys will not be
22 objective again, so I am -- I am taking the Fifth.
23   **Q**    I understand.
24       And when you take the Fifth, you're
25 asserting the privilege against self-incrimination,

75

1  which means that you believe that your answer might
2  tend to incriminate you.  That's what you're saying,
3  Mr. Trikantzopoulos?
4    **A**    When I assert this, I believe that without
5  the privilege of legal advice, my answer might not be
6  phrased correctly or might be giving you the
7  information that is not necessarily for this case or
8  information you might use to effect my interest in a
9  lot of different capacity that will affect my ability
10 to defend myself in the future.
11   **Q**    I understand.
12       Let me put it to you this way.  We've sued
13 for securities fraud, right, because we believe that
14 you've lied to investors, like Mr. Antonas and Ms. Hood
15 and others, and so because of that, we've sued you for
16 making false representations.  And so to the extent
17 that you make representations about why you're not
18 answering questions on the record, we don't take those
19 at face value because we believe that you've lied in
20 the past and we don't believe in your credibility.
21       And so you can say things on the record
22 about why you're not answering questions, but what you
23 need to know is that when you assert the privilege
24 against self-incrimination, the proper use of it is
25 only to refuse answers that might tend to incriminate

76

1  you, and so when you make that assertion, right, by
2  refusing to answer questions based on the privilege
3  against self-incrimination, the inference from that is
4  that the answer that you would give would tend to
5  incriminate you.  And you just need to know that that
6  is the effect of what you're doing.
7     A    Mr. Harper, the statement that you just
8  made may sound extremely easy to understand for you.
9  It is not black and white for me.  I don't have -- what
10 I'm saying to you, while I believe that I might
11 understand what you're saying, it is not a black and
12 white situation.
13       Also, you mention that you believe I have
14 committed securities fraud.  Okay.  That is a
15 statement.  That's why you're investigating.
16    Q    It's in the complaint.  It's in the
17 complaint that was filed by the Commission.
18    A    You're trying to prove that I have
19 committed securities fraud, sir, correct?
20    Q    Yes.  That's my job in representing the
21 Commission is to present -- is to present evidence --
22 to collect evidence and present it.
23    A    Mr. Harper, there's a difference between
24 saying we believe this has happened and a difference to
25 say that we are trying to prove a case.

77

1        So we can continue now.
2     Q    Okay.
3        Who is the Jean Francois that is mentioned
4  in your Email of -- that's marked as Exhibit 28A?
5     A    I'm taking the Fifth.
6     Q    Identify all partners that you had in
7  Navis Ventures as of June 25th, 2018?
8     A    I'm taking the Fifth.
9     Q    Identify all employees that Navis Ventures
10 had as of June 2018?
11    A    I'm taking the Fifth.
12    Q    Did it have any employees, other than you?
13    A    I'm taking the Fifth.
14       (SEC Exhibit 29 was marked for
15       identification.)
16 BY MR. HARPER:
17    Q    All right.  I'm going to show you now
18 what's been marked as Exhibit 29.  Do you see Exhibit
19 29 before you?
20    A    Yes, I do.
21    Q    Okay.
22       And this is a copy of an offer of
23 employment that you made to Jean Francois Regnauld?
24    A    Correct.
25    Q    And if we look at the third page of

78

1  Exhibit 29, the offer is signed on behalf of Navis
2  Ventures by you?
3     A    I'm taking the Fifth.
4     Q    And it's accepted and agreed by Mr. Jean
5  Francois Regnauld?
6     A    I'm taking the Fifth.
7     Q    The acquisition of the Korean company that
8  would fund Navis Ventures was never completed; isn't
9  that right?
10    A    There was a different entity that bought
11 that company.
12    Q    I'm sorry.  Say that again.  I couldn't
13 hear you.
14    A    It was a completely different entity that
15 bought that company.
16    Q    A different entity.  It was never
17 completed.  And then I didn't hear that last part.
18    A    What I am saying is, that the SeokJung
19 company from South Korea was acquired by a different
20 company, so -- that's all.
21    Q    And Navis didn't participate in that
22 acquisition, right?
23    A    No.  It's a completely different offer.
24    Q    And Navis Ventures didn't participate in
25 an acquisition of another Korean company called Axia,

79

1  right?
2     A    We discussed the acquisition.
3     Q    Yes.  You discussed it with Mr. Antonas
4  among other people, right?
5     A    Among other people, I do not know what
6  you're referring to.  What I know that I didn't even
7  discuss much with Mr. Antonas.  I know that I had
8  discussed with the actual company the possibility to
9  acquire interest.  That's what I'm referring to.
10    Q    All right.  But that acquisition was never
11 made by Navis Ventures, either, right?
12    A    It was an extremely, extremely long
13 process for different reasons that I'm not going to get
14 into.  It was never acquired.  Correct.  Correct, it
15 was never acquired.
16    Q    Okay.
17       And Mr. Antonas requested that Navis
18 Ventures refund his principal investment as guaranteed,
19 right?
20    A    I'm taking the Fifth.
21    Q    And you agreed to return Mr. Antonas's
22 principal investment, right?
23       Mr. Trikantzopoulos, did you agree to
24 return Mr. Antonas's principal investment?
25    A    Mr. Harper, I did hear you.  Okay.  I'm

80

1  just trying to decide how I'm going to answer that
2  because I want to --
3      Q    I'm sorry.
4      A    -- maybe, maybe, maybe say something
5  extra.
6      Q    Very well.  Take your time.
7      A    Okay.
8           I can make one statement, Mr. Harper.
9  Okay?
10     Q    Go ahead, Mr. Trikantzopoulos.
11     A    I -- I have never taken money from anyone
12  in the world that I didn't have an equal amount in cash
13  to provide, and I want to emphasize that once and
14  forever.  I never took any penny from anybody in the
15  world that I could not repay them.  Under no
16  circumstance have I ever done this, never.
17     Q    Have you paid Mr. Antonas?
18     A    Your question here was that -- your
19  question was, if I repay him?  And my answer is:  I
20  told him I'm going to repay him.  And anybody that I
21  ever told them that I'm going to repay him, I stand my
22  promise forever.  I never go back to promise I made,
23  never.
24     Q    Okay.  So you agreed to pay Mr. Antonas
25  back his principal investment --

81

1      A    That's correct.
2      Q    Have you paid him that money?
3      A    Not until today.
4      Q    What do you mean not until today?  Did you
5  pay him two hundred thousand dollars today, April 20th,
6  2021?
7      A    Let me rephrase.  You're absolutely right.
8  The statement was not correct.  Okay?
9           What I mean is, payment has not been made.
10  As of today, payment has not been made.
11     Q    Okay.
12          And when you say every time you take in
13  money, you've always had an equal amount in cash.  Did
14  I understand that correctly?
15     A    What I mean that, I have never taken money
16  from anybody, borrowed money, that I did not have at
17  least an equal amount that I know I have direct or
18  indirect access and promise to repay.
19     Q    Okay.
20          So what I would like to know then is, when
21  you took Mr. Antonas's two hundred and fifty thousand
22  dollars on June 27th, 2018, where was the other two
23  hundred and fifty thousand dollars that you had?
24     A    Outside of the United States.
25     Q    Where?

82

1      A    I don't want to discuss this now.
2      Q    What is your basis for refusing to answer
3  the question?
4      A    I don't know how to answer the question.
5      Q    Why are you refusing to answer the
6  question to identify where this other money that you
7  say that you had direct or indirect access to?
8      A    It is part of my -- I'll call it defense.
9  I don't know how this case proceeds further.  I don't
10  know how to explain it, Mr. Harper.  Again, because I
11  don't have the legal advice, I don't want to get into
12  areas that might be -- I'm not ready to answer now.
13  I'm not avoiding.  I'm delaying.
14     Q    Sitting here today -- sitting here today,
15  you're refusing to identify this other source of money
16  that is not in your Bank of America bank accounts or
17  other bank accounts in the United States?
18     A    Okay.  Mr. Harper, let me answer the
19  question.  That was a more clear question to me by you.
20  Okay?  It was inheritance money since 1988.
21     Q    It was what?  Sorry.
22     A    Inheritance money from 1988.
23     Q    Inheritance money from 1998.  Inherited
24  from whom?
25     A    '88.  Sorry.  1-9-8-8.

83

1      Q    Right.
2           Inherited from whom?
3      A    From my father.
4      Q    Okay.
5           And where are these funds located?
6      A    They were located offshore.
7      Q    They were located, sorry, where?
8      A    Offshore.
9      Q    Offshore.  So outside the United States?
10     A    Yes.  I was not in the United States --
11  actually, sorry, I do.  I was in the United States.  My
12  father passed away outside the United States.
13     Q    Why haven't you used this money to pay
14  back Mr. Antonas?
15     A    Because my younger brother had -- had the
16  authority to use it.
17     Q    Okay.
18          And I understand that he's passed away?
19     A    Yes, sir.
20     Q    Okay.
21          So why haven't you used the money since
22  the time of his passing to pay Mr. Antonas?
23     A    I'm taking the Fifth.  And I would like to
24  also say that my recent lawyer when I asked him last
25  June if I can pay back Mr. Antonas, he told me the

84

1 moment this procedure with the Securities and Exchange
2 Commission, I cannot pay anything.
3     Q     Okay.  So here's something that you should
4 know.  Under American law, conversation with your
5 lawyer are privileged, and I am not asking you to talk
6 about what you discussed with your lawyer at any time.
7 Okay?
8     A     No, you did not ask.  Mr. Harper, you did
9 not ask what we discussed.  My understanding was from
10 legal advice that I got, that when I --
11     Q     Stop.  Stop.  Stop.  Stop.  Stop.  You
12 need to understand that conversations with a lawyer are
13 privileged communications.  If you chose to disclose
14 them, that's your choice voluntarily, but I need to
15 inform you that conversations with your counsel are
16 privilege.  Do you understand?
17     A     Mr. Harper, I did not say that my current.
18 My previous counsel was the one who provided this
19 advice.  Okay?  I said that my understanding was that
20 during this process, if I ever wanted to repay anybody
21 because of the status of the process, I might -- I
22 cannot.  It is not -- that's my understanding that I
23 got from different sources.  Because you asked me why I
24 did not pay Mr. Antonas.  So my answer is, one of the
25 reasons that I did not pay Mr. Antonas was because I

85

1 was told from different sources that during that
2 process, I could not.
3     Q     Okay.
4           So you were not sued by the SEC until June
5 of 2020.  Why didn't you pay back Mr. Antonas before
6 you were sued?
7     A     I did not have access to the funds.  And
8 still I don't have access to these funds.
9     Q     Why don't you have access to the funds?
10     A     I'm taking the Fifth.
11     Q     Okay.
12           I want to make sure that the record's
13 clear on this.  You didn't have access to the funds
14 when your brother was alive, right?
15     A     Well, I had indirect access.  Okay.
16 Mr. Harper, the difficulty is I don't want to explain
17 because it's complicated.  Okay.  And I'm not going to
18 be -- and one of the reasons I said that I had to find
19 about this procedure was exactly this, because I had a
20 very sick brother that I had to deal with, and the
21 agreements that I had were before he became sick.  So
22 he could not complete that transaction assuming that
23 everybody is trying to mislead other people.  There are
24 other parties here that had to go through extreme
25 circumstances.  Okay?  So I'm going to take the Fifth

86

1 about this, so --
2     Q     All right.  So let's narrow it a little
3 bit more.  You did not have access to this money to pay
4 back Ms. Hood, right?
5     A     There was a condition that I didn't want
6 to fulfill.  The money could have come and paid
7 Mrs. Hood, but there was a condition enforced by my
8 younger brother that I did want not want to fulfill.
9 I'll put it that way.
10     Q     What was the condition?
11     A     I cannot reveal.
12     Q     Are you saying that you're not going to
13 reveal the condition today?
14     A     I'm not going to reveal the condition
15 today, that's correct.
16     Q     Okay.
17           You did not have access to the money to
18 pay back Mr. Torres?
19     A     I did not have actually money to pay
20 anybody.  I had the -- that's correct.  Yes, anybody.
21 Anybody that took money, I did not have access to repay
22 them, that's correct.
23     MR. HARPER:  All right.  So we've been
24 going for another hour, and the way I feel about --
25 or my experience has been with these depositions that

87

1 it's good to take a break every hour or so, so people
2 don't get tired.  And I will say again, I think we're
3 moving at a pretty good pace.  I think I probably
4 have another hour or so.  So why don't we take
5 another ten-minute break, and then we'll come back.
6 Does that sound good?
7     THE WITNESS:  I appreciate that.  Thank
8 you.
9           (Whereupon, at 11:18 a.m., a short recess
10           was taken.)
11           (SEC Exhibit 34 was marked for
12           identification.)
13 BY MR. HARPER:
14     Q     I'm going to show what has been marked as
15 Exhibit 34.  Do you see that Exhibit 34 is an Email
16 from Mr. Antonas to you, dated October 2nd, 2019?
17     A     Yes.
18     Q     And this Email concerns his request to
19 have his principal investment repaid as guaranteed?
20     A     Yes.
21     Q     And in the second sentence of the Email,
22 he says, "Attached you will find the message I received
23 from you saying that you will use your inheritance to
24 pay back the capital owed."  Do you see that?
25     A     That's correct.  That's correct.

88

1   **Q**    All right.
2      So if we look at the second page of
3 Exhibit 34, we see an attachment to the Email that
4 appears to be a picture of a text message. Do you see
5 that?
6   **A**    Yes, I do.
7   **Q**    Is that a text message that you sent to
8 Mr. Antonas?
9   **A**    Yes, I did.
10   **Q**    And despite what's written here, you never
11 used your inheritance to pay back Mr. Antonas; isn't
12 that right?
13   **A**    Yes. Mr. Harper -- excuse me? Hello?
14   **Q**    I'm sorry. Is that right, that despite
15 what's written here, you've never used your inheritance
16 to pay back Mr. Antonas tons?
17   **A**    Yes. Actually, there are two things I
18 would like to explain, Mr. Harper. Okay?
19   **Q**    Could you just answer the question first.
20 Is it true?
21   **A**    Can you repeat the question then again,
22 please?
23   **Q**    Yes.
24      Despite what's written here in this text
25 message that you sent to Mr. Antonas, you have not used

89

1 your inheritance to pay him back?
2   **A**    Yes. Mr. Harper, I would like to
3 emphasize that the nature of the questions ignore
4 substantial facts in the process, as well as
5 differences in something extremely substantial. As of
6 today, Mr. Harper, I have not demanded my inheritance
7 formally. I have demanded it -- I have not formally
8 demanded it. So I do have access to inheritance, but I
9 have not formally demanded it.
10      So this is something that you should know,
11 because you keep saying, basically, making a case that
12 I did not do something, okay, because I have misled. I
13 had every good intention, but the system and the
14 process in Greece, especially when the COVID hit,
15 became completely different.
16      And another thing that's a fact in the
17 whole equation, that nothing indicates here I have
18 never misled the people you say that I misled. I have
19 never committed securities fraud despite of what you
20 believe I have done or have not done. Okay.
21      So what I am saying to you here is there
22 is inheritance. There was inheritance when I stated.
23 Inheritance was partially my own funds with my younger
24 brother. That was an agreement I had since 1992 with
25 my younger brother.

90

1      And I would like to emphasize also because
2 they have a statement that we had shipping interest for
3 a long period of time and money was always also with
4 shipping interest. So having saying that, I'm not
5 going to expand on this, and I'm going to say that we
6 have a practical -- how can I say that -- issue at this
7 stage. Number one, while you do have the privilege to
8 have this start this conversation with me at nine
9 o'clock in your time, Boston time, I have the
10 disadvantage of coming late during the day. After a
11 full day, I am asked to answer questions that are
12 extremely sensitive, affect the rest of my life. I
13 have not yet rendered legal advice, as you know. I
14 have stated that this conversation is most probably
15 recorded by a foreign government, something that you
16 don't want to put into the record because you don't
17 really care. Okay. But I do care, because I am a
18 foreigner in a foreign country.
19      And I am saying -- stating that any time
20 that I said to anybody of the people that you're going
21 to bring up now, tomorrow, or any other day that I
22 would be able to give, I had an equal amount at least
23 to be deployed. The circumstances of my younger
24 brother had changed his mind against specifically the
25 funds that affected me substantially.

91

1      Having said that, I would like to tell
2 that you the reason I'm using the Fifth -- the right --
3 the Fifth Amendment, if I'm correct, is because there
4 are issues that I would prefer to discuss first before
5 I answer to you with a lawyer. That's why I'm using
6 it, and I'm staying with that. The reason I was saying
7 about the reasons was because of the relationship I had
8 with my younger brother, and I made the statement to
9 you, and it's the only statement I'm going to make
10 today about this and about everything you tell me. I
11 am getting not capable of answering your questions very
12 soon, because I'm really tired. I'm getting tired.
13 And I'm sure you do understand that at this point.
14   **Q**    Well, as I said, we've been taking a break
15 every hour to make sure that you have a break from the
16 testimony.
17      You had mentioned early on in your
18 narrative that you had not made a demand for your
19 inheritance. Did I understand that correctly?
20   **A**    Mr. Harper, I had the inheritance. There
21 is a specific process that I had about the inheritance.
22 Okay?
23   **Q**    Yes. And I understand that there is a
24 demand -- you said that there was a demand -- that you
25 have not made your demand to your inheritance; is that

92

1  right?
2    A    I'm still a little bit confused actually
3  myself about something.  Okay.  There was the option
4  to -- even if I didn't want to have the inheritance, I
5  had to declare that I don't have the inheritance.  I
6  don't want the inheritance.  After a period of time, it
7  continued automatic that I must have the inheritance.
8  There is a process that I have not moved ahead because
9  I'm trying to satisfy a specific conditions in Greece
10  in some interest that I have before I take ahold of
11  this.
12    Q    What month was it that your younger
13  brother passed away?
14    A    January -- January 27th of 2019.
15    Q    January 27th of 2019.  Okay.
16        And during the entire year of 2019, you
17  didn't make a demand on the inheritance?
18    A    I have not formally made a demand on the
19  inheritance because my understanding is, once I made a
20  demand for the inheritance, I do not access to any
21  possible additional inheritance that my brother might
22  have had.  There is a dispute that I had with a
23  specific entity about money that my brother might have
24  used, but his psychological condition might have given
25  away under illegally, put it that way, somebody might

93

1  have taken -- some entity might have taken money away
2  from him.  So I'm trying to be very careful how I'm
3  going to resolve that, so --
4    Q    And because you have not made a demand for
5  that inheritance, you have not had access to any of the
6  money that's part of that inheritance?
7    A    I have tried to access specific funds that
8  are liquid that my brother had put in specific assets,
9  but it's a little bit more complicated because the
10  party -- the parties now control.  They have their own
11  demands.  I cannot lose this money.
12    Q    You cannot what this money?
13    A    Lose.  I can make moves that I'm going to
14  risk inheriting this money.
15    Q    Okay.
16        So since your brother has died, you have
17  not had access to any of this inheritance money?
18    A    That's correct.  We can say that.
19    Q    Okay.
20        All right.  So, Mr. Trikantzopoulos, who
21  is Werner Fuls?
22    A    A South African national.
23    Q    And does he represent a family office
24  investment organization?
25    A    He represents investors.

94

1    Q    Who are they?
2    A    Who are they?  I -- I'm not a hundred
3  percent sure.
4    Q    Okay.
5        Have you ever taken an subscription fee or
6  investment from Werner Fuls or an investment company
7  that he represents?
8    A    He -- I have taken from an entity that he
9  has money for -- as because he was becoming a partner
10  with me.
11    Q    In March of 2020, did you take a
12  seventy-five thousand dollar subscription fee from
13  Mr. Fuls or his investment company?
14    A    Yes.
15    Q    And what was Mr. Fuls subscribing to?
16    A    I'm using the Fifth.
17    Q    I'm sorry?
18    A    I'm taking the Fifth.
19    Q    Oh, you're taking the Fifth.  I see.
20    A    Yes, sir.
21    Q    What investment opportunity did you offer
22  for that subscription fee?
23    A    I'm taking the Fifth.
24    Q    Okay.
25    A    Anything related to Mr. Werner, Fifth,

95

1  because I'm still in discussion about something very
2  important.  I'm taking the Fifth.
3    Q    Okay.
4        So just make sure I understand.  You are
5  going to assert the Fifth Amendment privilege against
6  self-incrimination concerning all questions about
7  Mr. Werner or his investment activities with you?
8    A    Minervest discussions I have,
9  presentations I made or he made to me, et cetera, et
10  cetera, et cetera, yeah.
11    Q    Okay.  And you used the word "Minervest".
12  That's the name of Mr. Fuls's investment entity?
13    A    He had -- my understanding, he has control
14  of this entity.
15    Q    Minervest, spelled M-I-N-E-R-V-E-S-T?
16    A    M-I-N-E-R-V-E-S-T.
17    Q    Sorry.  I'll do it phonetically.  Mike,
18  indigo, November, echo, romeo, Victor, echo, Sierra,
19  tango; is that right?
20    A    That's what I remember, sir, yes.
21    Q    Yes.  Thank you.
22        (SEC Exhibit 37 was marked for
23        identification.)
24  BY MR. HARPER:
25    Q    All right.  So I'm now showing you Exhibit

96

37.  Do you recognize 37 to be a promissory note for
seventy-five thousand dollars --

    **A**    As I mentioned before, Mr. Harper, I am
take the Fifth anything related to Minervest, Black
Falcon Capital, and any communication I had with
Mr. Werner.

    **Q**    Okay.  So I'm just going to ask specific
question.  You can assert whatever privilege you
believe is applicable.  Okay?

    So Exhibit 37 is a promissory note for
your company, Pevadi Brothers, to borrow seventy-five
thousand dollars from Mr. Fuls's company, Minervest?

    **A**    I'm taking the Fifth.

    **Q**    And this was the document that you used
for guaranteeing Mr. Fuls's seventy-five thousand
dollars subscription fee?

    **A**    I'm taking the Fifth.

    **Q**    Now, at the time that you signed this
promissory note -- or let me ask you that question
first.

    Let's go to the fifth page of Exhibit 37.
Is that your signature above the name Basil
Trikantzopoulos on behalf of Pevadi Brothers, LLC?

    **A**    That's correct.

    **Q**    Did you say that's correct?

    **A**    Yes, I did.

    **Q**    Okay.

    And after you signed this promissory note
and provided it to Mr. Fuls, did he wire you
seventy-five thousand dollars --

    **A**    I'm taking the Fifth.

    **Q**    Okay.

    And at the time that Mr. Fuls wired the
money to the Pevadi Brothers' account, isn't it true
that that account had twelve dollars in it?

    **A**    I'm taking the Fifth.

    (SEC Exhibit 38 was marked for
    identification.)

BY MR. HARPER:

    **Q**    Okay.  I'm now showing you what has been
marked as Exhibit 38.  Do you see Exhibit 38 before
you?

    **A**    Yes.  I'm taking the Fifth.

    **Q**    Okay.

    And do you see that this is a Bank of
America --

    **A**    The suggestion of the Securities and
Exchange Commission these days has been based on I am
not sincere to the fact that I had money always to
balance any amount that I had taken from anybody else.

So you can say whatever you feel like it.  You can say
what you believe.  The facts will present a completely
different story, sir.  So you can keep asking these
questions and try to put different thoughts in a very
restricted, limited way to create an argument, but the
reality is completely different, and I stand by what I
have said to you before, sir.  I am going to continue
using my Fifth Amendment.

    **Q**    Very well.

    Do you see that Exhibit 38 is an account
statement for Bank of America bank account --

    **A**    I'm using my Fifth Amendment, sir.

    **Q**    Okay.

    And do you see that it's for a checking
account opened for Pevadi Brothers, LLC?

    **A**    Fifth Amendment.

    **Q**    And the period of the statement is for the
month of March 2020?

    **A**    I'm taking the Fifth.

    **Q**    And the beginning balance of this account,
according to the account summary on page one of this
exhibit, was twelve dollars and forty-two cents?

    **A**    I'm taking the Fifth.

    **Q**    And if we go to the third page of this
account statement to the section on deposits and other

credits, do you see that now on your screen?

    **A**    I'm taking the Fifth.

    **Q**    And do you see that there's only one
deposit in the month of March, and that was for -- it
was a wire transfer of seventy-five thousand dollars
from PKF Capital Markets on March 12th, 2020?

    **A**    I'm taking the Fifth.

    **Q**    And this was the transfer made by Werner
Fuls to pay the subscription agreement?

    **A**    Mr. Harper, I'm going to state that this
answer is very simply for me to state, but, again,
because of the nature of the questioning and the
direction you have taken or chosen to take because
you're trying to make your case, I'm left with no
choice but to take the Fifth, but it's evident that
that was from Mr. Werner.

    **Q**    I didn't get that last piece.  Did you say
you're taking the Fifth with regard to everything
concerning Mr. Werner?

    **A**    I have said that numerous times and you
keep asking questions about Mr. Werner, sir.

    **Q**    Yes.  I have specific questions.  That's
the way the process works, so --

    **A**    Mr. Harper, I mentioned, I think that
you're using pressure on me or trying to take me off

1  guard.
2      Q    No.
3      A    Yes, that's what I believe, sir.  Because
4  when I state officially on the record that I'm going to
5  use my Fifth Amendment for the rest of the period, but
6  you keep asking specific questions.  You're trying to
7  intimidate and you're trying to pressure me, sir, in
8  spite of the fact that I have suggested different
9  things.
10     Q    Well, this question is just about
11 Exhibit 38, which is this bank account statement that
12 you have before you on your screen.  Do you see on this
13 page that there are check card withdrawals between
14 March 2nd and March 11th, 2020?
15     A    I see some of these check cards, yeah.
16     Q    Yes.  Yes.
17          So there's a check card on March 2nd for
18 www.1and1.com for five dollars.  The next one the next
19 day for Law Insider, twenty-nine dollars.  The next one
20 apple.com for nineteen dollars.  Do you see these
21 charges?
22     A    Yes, I do.
23     Q    And as we had seen at the beginning of the
24 questions on this topic, on page one of Exhibit 38, the
25 beginning balance was twelve dollars, right, twelve

101

1  dollars and forty-two cents?
2      A    That's correct.
3      Q    So for the first ten days of the month a
4  check card was being used on this account for funds
5  that it didn't have, right?  Because the charges here
6  are over the twelve dollars that it started with at the
7  beginning of the month, right?
8      A    Yes.
9      Q    And if we go down to service fees, which
10 is on page five of this exhibit, we see that Bank of
11 America charged the Pevadi Brothers' account several
12 times for overdraft fees between March 2nd and
13 March 11th, right?
14     A    Yes.
15     Q    All right.  So let's go back up to the
16 page where the wire transfer appears.  And now we're on
17 page three of Exhibit 38, and you should see at the top
18 of the page a wire transfer of seventy-five thousand
19 dollars on March 12th, 2020.  Do you see that?
20     A    I do.
21     Q    And on the same day that you received --
22 or excuse me, that Pevadi Brothers received this
23 seventy-five thousand dollar wire transfer, you
24 transferred -- or Pevadi Brothers transferred
25 twenty-four thousand dollars to your personal bank

102

1  account, right?
2      A    It might be the case, but -- yeah.
3      Q    Okay.
4          And you also transferred six thousand
5  dollars to your attorneys at Burns & Levinson.  That
6  was the next wire transfer on that day.
7      A    Okay.
8      Q    Is that right?
9      A    Mr. Harper, you're making a statement that
10 are stated here.
11     Q    Is it true that on March 12th, 2020 as
12 reflected in the statement, after the seventy-five
13 thousand dollars came in, you transferred six thousand
14 of it to your attorneys at Burns & Levinson?
15     A    You are repeating the facts in front of
16 you, sir.
17     Q    So you agree that that's true then?
18     A    Yes, I do.
19     Q    Okay.
20          (SEC Exhibit 39 was marked for
21          identification.)
22 BY MR. HARPER:
23     Q    All right.  So I'm now going to show you
24 what's been marked as Exhibit 39.  Do you see Exhibit
25 39 before you on the screen?

103

1      A    Yes, I do.
2      Q    And this is a Bank of America account
3  statement for the joint checking account you hold with
4  your wife, Elena Catizone?
5      A    That's correct.
6      Q    And the period is February 27th to
7  March 27th, 2020?
8      A    That's correct.
9      Q    And if we look at the account summary, the
10 beginning balance as of February 27th was four hundred
11 and fifty-nine dollars and sixty-five cents?
12     A    I'm going to take the Fifth on everything
13 that has to do with any Bank of America account and any
14 relationship to Mr. Werner's transactions in relation
15 to this bank account.
16     Q    Okay.  Understood.
17          If we go to page three of the statement,
18 we see there that the section on deposits and other
19 additions.  Do you see that on your screen?
20     A    Yes, I do.
21     Q    And for the dates of February 28th through
22 March 10th, 2020, there are, approximately, eight
23 thousand dollars worth of deposits, right?
24     A    Yes.
25     Q    And then on March 12th, we see the

104

1  transfer of twenty-four thousand dollars from the
2  Pevadi Brothers' account?
3      A    Yeah.  These are facts that's stated in
4  the bank statement, Mr. Harper.
5      Q    I understand.  I have to take you through,
6  so I can establish what was in the account when.
7  That's the purpose of going through this.
8          So let's go through the withdrawals on
9  page four.
10     A    Mr. Harper, I'm going to take the Fifth
11 because the nature of the questioning states facts that
12 you know and I know.  There's no purpose behind
13 delaying the procedure to make me more tired and try to
14 figure out the weapon that you need to create the
15 situation I might say something under duress.
16     Q    I understand that you're concerned that
17 your answers might tend to incriminate you and that you
18 want to assert the Fifth.  That's fine.  That's your
19 right.
20     A    This is only part of the situation, sir.
21 You're ignoring the fact that I stated that we have a
22 time division.  I'm physically and mentally tired.
23 You're ignoring that, because you have the privilege of
24 asking me questions fully prepared.  You're a lawyer
25 and in Boston at nine o'clock in the morning while I am

105

1  in a different country, tired with no legal advice, and
2  at the same time, stating that this conversation is
3  being recorded by a foreign entity.  Now, this is
4  ignored by you, purposely or not purposely.  Okay.  I
5  think at least I should have the privilege to have some
6  equal -- some understanding on that level.  Your
7  questions are a process, and you're trained to do so.
8  I fully understand that.  But the questions do not have
9  any validity as questions.  Everybody knows when they
10 see that what it is and what it is not.
11     Q    Okay.  Going back to Exhibit 39, on page
12 four of the exhibit, there's a section, Withdrawals and
13 Other Subtractions.  Do you see that before you?
14     A    I do.
15     Q    And between March 2nd and March 10th on
16 this page, it appears that this account had more than
17 fifteen hundred dollars worth of withdrawals, right?
18 There were two ATM withdrawals of, approximately, five
19 hundred dollars.  There's an Airbnb payment of two
20 hundred and thirty-eight dollars.  And another Airbnb
21 payment of three hundred and nineteen dollars.  Do you
22 see those?
23     A    Mr. Harper, you have your questions.  You
24 continue the same line of questions, that you're
25 stating the facts in front of you on things that you

106

1  know they're accurate.
2      Q    Okay.
3          If we go down to page seven of Exhibit 39,
4  we see on March 2nd, 2020, there was a payment to SGH
5  Real Estate of two thousand, five hundred and two
6  dollars.  Do you see that?
7      A    I'm taking the Fifth.
8      Q    Okay.
9          And is that a rental payment?
10     A    I'm taking the Fifth.
11     Q    For what property?
12     A    I'm taking the Fifth.
13     Q    So based on the withdrawals that we just
14 reviewed between March 2nd and March 10th, your account
15 had at least four thousand dollars in withdrawals,
16 right?
17     A    I'm taking the Fifth.
18     Q    And on March 12th, you transferred
19 twenty-four thousand dollars from the Pevadi Brothers'
20 account?
21     A    I'm taking the Fifth.
22     Q    What large expense was that transfer meant
23 to cover?
24     A    I'm taking the Fifth.
25     Q    Let's take a look at the checks that were

107

1  issued on this account on page eleven of Exhibit 39.
2  Do you see the checks, the copies of checks?
3      A    Yes, I do.
4      Q    And do you see that on March 13th, the day
5  after the transfer of twenty-four thousand dollars,
6  your wife issued a check on this account?
7      A    I'm taking the Fifth.
8      Q    And the check was for seven thousand, nine
9  hundred and nine dollars and seventy-five cents?
10     A    I'm taking the Fifth.
11     Q    And the check was made out to Babson
12 College?
13     A    I'm taking the Fifth.
14     Q    And written on the check memo is, Tuition
15 for a Luke Trikantzopoulos, right?
16     A    I'm taking the Fifth.
17     Q    He's your son?
18     A    Only four males in the world have the same
19 last name you mentioned.
20     Q    Say that again.
21     A    Only four male people in the world have
22 the same last name you mentioned.  One of them is my
23 son.
24     Q    So Luke Trikantzopoulos is your son?
25     A    Yes.

108

1    Q    And did you tell Werner Fuls that you plan
2  to use his subscription fee to pay for your son's
3  college tuition?
4    A    I'm taking the Fifth.
5        I would like to remind that you that I
6  have stated I will take the Fifth anything related to
7  Mr. Werner Fuls directly or indirectly.  You're
8  continuing to ask questions that will always result
9  Werner Fuls here, and I would like to remind you that I
10 have an ongoing situation with Mr. Fuls that I would
11 like to resolve.  It's something between the two
12 individuals, Werner and myself.  At this stage, you
13 keep trying to make me tired to get answers from
14 questions.  Again, I'm under duress.  I'm tired, so --
15    Q    Okay.  We don't have much further to go,
16 Mr. Trikantzopoulos.
17       Did Pevadi Brothers ever have any
18 employees, other than you?
19    A    I'm taking the Fifth.
20    Q    When did Pevadi Brothers stop operating?
21    A    I'm taking the Fifth.
22    Q    What is Black Falcon Capital?
23    A    I mentioned again that I would not talk
24 anything -- I will take the Fifth anything related to
25 Black Falcon and Mr. Werner Fuls and anything to do

109

1  with that entity.
2    Q    Okay.
3        So are you asserting the Fifth Amendment
4  to the question of what is --
5    A    Yes.  You're breaking up again statements
6  about related to Black Falcon.
7        (SEC Exhibit 40 was marked for
8        identification.)
9  BY MR. HARPER:
10    Q    All right.  Exhibit 40, is that a copy of
11 the Articles of Organization for Black Falcon Capital?
12    A    Yes.
13    Q    Why did you organization Black Falcon
14 Capital as a Kentucky limited liability company?
15    A    Because of the relationship I had with the
16 organizer.
17    Q    Okay.
18       And who are they?
19    A    Mr. Charabakis.
20    Q    Could you spell that, please.
21    A    His first name is John.  Last name is C,
22 like cat, H-A-R-A-B-A-K-I-S.
23    Q    Is he a resident of Kentucky?
24    A    Yes, he is.
25    Q    And what is his role in Black Falcon

110

1  Capital?
2    A    Well, Mr. Harper, I was really hoping that
3  I'm going to create an income with Mr. Charabakis
4  making sure that I comply with all the laws and
5  regulations if anything because I was not intending to
6  be in anything related to investments.  And that's
7  about it.
8        THE COURT REPORTER:  I'm sorry.  Can you
9  repeat the answer, please.
10 BY MR. HARPER:
11    Q    I'm having a hard time hearing that, too.
12       Mr. Charabakis is a person I respect a
13 lot.
14        THE COURT REPORTER:  He's a what?
15 BY MR. HARPER:
16    Q    He's a what?
17    A    A professional I respect a lot.  He's very
18 familiar with regulations and related items.  And I
19 believe that in the event that in the future I get in
20 something that is not appropriate, Mr. Charabakis will
21 be able to assist me.  Because, again, I didn't want to
22 fall into a -- how do you say that -- fall into a
23 wrongdoing without my knowledge.
24    Q    What was the purpose for which you
25 organized Black Falcon Capital?

111

1    A    The purpose was to -- to work with a
2  family offices and assist them to evaluate companies,
3  not to invest or co-invest, but the goal was to figure
4  out ways that we could do in the future.  It was a
5  process I was trying to establish with Mr. Werner what
6  to do in the future.  We were not starting anything.
7  It was just a beginning.  We were not sure how this was
8  going to move ahead, so --
9    Q    Who is Matt Henderson?
10    A    Mr. Charabakis was using this lawyer from
11 Kentucky to organize the business.
12    Q    And what role does he have in Black Falcon
13 Capital?
14    A    No.  He's the organizer.  He never had any
15 role in Black Falcon.  Black Falcon never moved to the
16 next stage.  We were trying to decide on different
17 things.  I was organizing this.  COVID happened.  We
18 are regular securities, basically.  Because we want
19 to --
20        THE COURT REPORTER:  I'm sorry.  I'm
21 sorry.  Can you repeat that, please.  You're going
22 really fast, and I'm having a hard time
23 understanding.  If you could please slow down.
24        THE WITNESS:  I understand that.  When I
25 get tired, my accent becomes worse.  I tend to talk a

112

1  little bit faster, a little bit more Greek for most
2  of the people.
3           I don't even remember what was the
4  question. I'm sorry.
5           MR. HARPER: Can you read back the
6  question, Brigitte.
7           (Whereupon, the Court Reporter read back
8           the question.)
9           THE WITNESS: None really. It was just
10 the organizer. He didn't have any role.
11 BY MR. HARPER:
12    Q    What investments have you offered through
13 Black Falcon Capital?
14    A    None. It was never a purpose to offering
15 investments, sir.
16    Q    Okay.
17           (SEC Exhibit 41 was marked for
18           identification.)
19 BY MR. HARPER:
20    Q    All right. I'm now showing you what has
21 been marked as Exhibit 41. Do you see that?
22    A    Yes. And I'm using my Fifth Amendment
23 because, again, we're going back to Mr. Werner and
24 Black Falcon. So I'm using my Fifth Amendment.
25    Q    Okay.

113

1           A few minutes ago you said that you didn't
2  offer any investments through Black Falcon Capital, but
3  do you see that Exhibit 41 is a letter from you to
4  Mr. Werner?
5    A    Mr. Werner -- no. No. It is. It is a
6  letter to Mr. Werner, yeah.
7    Q    Yes.
8           And in the letter, you're saying to
9  Mr. Werner that you want to finalize the process for
10 his capital contribution to Black Falcon Capital,
11 right?
12    A    That's correct.
13    Q    And the contemplated capital contribution
14 is four hundred thousand dollars?
15    A    Despite the fact that I said that I'm
16 going to be using my Fifth Amendment, you want to
17 continue asking me questions, correct?
18    Q    So this is the process,
19 Mr. Trikantzopoulos.
20    A    Yes, explain to me.
21    Q    Yes. I ask the questions, right, and if
22 you would like to, you can assert your privilege
23 against self-incrimination not to answer the question.
24 Just because you take the Fifth doesn't mean that the
25 proceeding ends. Okay?

114

1    A    No --
2    Q    The privilege against self-incrimination
3  has to be -- please let me finish. The privilege
4  against self-incrimination has to be asserted on a
5  question by question basis. It doesn't terminate the
6  proceedings.
7           So if you don't want to answer these
8  questions because you believe that your answers might
9  tend to incriminate you, then you can assert the
10 privilege against self-incrimination by referring to
11 the Fifth Amendment. That is your right.
12    A    Okay. Can I rephrase what you just said?
13 If I say to you, it is your opinion, your professional
14 opinion here that if I say to you that anything related
15 directly or indirectly related to Black Falcon and
16 Mr. Werner, you still have -- and I'm not suggesting to
17 stop the process, but I said that anything related to
18 Black Falcon, as an example, I'm using my Fifth
19 Amendment, you say to me it doesn't not affect -- you
20 can still ask any question related to Black Falcon, and
21 I have to individually ask -- to answer the question,
22 correct?
23    Q    If you intend to assert the privilege
24 against self-incrimination against all questions about
25 Mr. Werner and Black Falcon, all you need to do is say

115

1  Fifth Amendment in response to the questions that I'm
2  asking about those subjects. If you believe those
3  answers would tend to incriminate you, then you can
4  assert the Fifth, but it doesn't stop -- it doesn't
5  stop me or the Commission from asking detailed
6  questions.
7    A    No, I'm not suggesting that for you to
8  stop asking detail questions. What I need to
9  understand, Mr. Harper, is that when I assert that
10 my -- the Fifth for anything related to Black Falcon
11 because I believe this might take the wrong turn for
12 me, basically, okay, that you still have the obligation
13 and the right to keep asking specific questions related
14 to Black Falcon, and I have to answer per question that
15 I'm using the Fifth despite of the fact that I said I'm
16 using the Fifth, I made a statement at the beginning,
17 for all Black Falcon questions on this today's
18 proceedings?
19    Q    Yes. The process is simple. Even though
20 you've said that you want to assert a blanket Fifth
21 Amendment, right, the next part of the process is, that
22 I continue to ask the questions that I was going to ask
23 today, show you the documents that I was going to show
24 you today, and if you believe that your answers would
25 tend to incriminate you and you want to assert the

116

1  Fifth, then you just do it on a question by question
2  basis.
3       A     Okay.  Now I understand, Mr. Harper.
4  Okay.  I'm following you now.  Okay.
5       Q     Okay.
6             MR. HARPER:  Brigitte, could you read
7  back the last question.
8             (Whereupon, the Court Reporter read back
9             the question.)
10            THE WITNESS:  Correct.
11 BY MR. HARPER:
12      Q     Okay.
13            And if we go down to the bottom of
14 Exhibit 41 on page two, there's a signature line for
15 Basil T.  Is that your signature on this?
16      A     That's correct.  That's correct.
17      Q     All right.
18            And does this letter set out the terms of
19 investment that you offered to Mr. Fuls to invest in
20 Black Falcon Capital?
21      A     Mr. Harper, my understanding is that once
22 somebody's an active partner in the business, they're
23 not investors.  Mr. Fuls was a partner in my business,
24 and we were supposed together to do specific things.  I
25 was waiting for this.  I knew I was going stay out of

117

1  the United States.  That was an entity that we might do
2  something in the future, but we were planning to do a
3  lot of things outside of the United States.  That was
4  one of the entities we were planning to do.  That's all
5  my knowledge of this specific transaction.  It's not an
6  investor.  It's a partnership between two of people,
7  that one of them is going to be an active partner.
8       Q     For the four hundred thousand dollars that
9  Mr. Fuls was investing, he was going to get eight point
10 three three percent ownership of Black Falcon and nine
11 point two seven of profit sharing rights of the
12 business of Black Falcon; is that right?
13      A     I'm asserting the Fifth, sir.
14      Q     Isn't that what it says in this letter
15 that you wrote and signed?
16      A     I'm asserting the Fifth, because as I
17 said, Mr. Harper, maybe you don't realize that I'm
18 falling asleep, and that's why that I'm asserting the
19 Fifth.  I don't have such room here.
20      Q     Okay.  Very well.  I understand that
21 you're asserting the Fifth.
22            (SEC Exhibit 42 was marked for
23            identification.)
24 BY MR. HARPER:
25      Q     All right.  I'm now going to show you

118

1  what's been marked as Exhibit 42.  And do you see that
2  Exhibit 42 is a letter signed by you?
3       A     Yes, sir.
4       Q     And does this letter document Mr. Fuls's
5  agreement that his company, Minervest, would invest
6  four hundred thousand dollars as capital contribution
7  to Black Falcon Capital?
8       A     Yes.  Yes, sir.
9             (SEC Exhibit 43 was marked for
10            identification.)
11 BY MR. HARPER:
12      Q     All right.  I'm now showing you what's
13 been marked as Exhibit 43.  Do you see that this is an
14 account statement from Fifth Third Bank?
15      A     I'm taking the Fifth.
16      Q     Okay.  And do you see this an account
17 statement for the bank account of Black Falcon Capital?
18      A     I'm taking the Fifth.
19      Q     And do you see that there's a deposit of
20 an incoming wire transfer of four hundred thousand
21 dollars on August 19th, 2020?
22      A     I'm taking the Fifth.
23      Q     Was this the investment of Werner Fuls --
24      A     I'm taking the Fifth.
25      Q     -- pursuant to agreements that we just

119

1  reviewed?
2       A     I'm taking the Fifth.
3       Q     You're taking the -- yes.
4             Then we see a series of wire transfers
5  from August 20th to 28th going out of the Fifth Third
6  Bank.  Do you see those?
7       A     I'm taking the Fifth.
8       Q     Some of those wire transfers were to your
9  wife, Elena Catizone, right?
10      A     I'm taking the Fifth.
11      Q     Isn't it true that you wired some of this
12 money to Ms. Catizone, and then she spent it on her car
13 payments to Toyota Financial Services?
14      A     I'm taking the Fifth.
15            (SEC Exhibit 44 was marked for
16            identification.)
17 BY MR. HARPER:
18      Q     I'm showing you know what's been marked as
19 Exhibit 44.  Do you see that this is a JP Morgan Chase
20 Bank account statement for the account of Elena
21 Catizone?
22      A     I'm taking the Fifth.
23      Q     Do you see that there's a wire transfer,
24 incoming wire transfer from Black Falcon Capital in the
25 amount of fifteen thousand dollars on August 20th --

120

1    **A**    I'm taking the Fifth.
2    **Q**    -- 2020?
3    **A**    I'm taking the Fifth.
4    **Q**    Thank you.
5          And do you see that on August 21st, after
6    that incoming wire transfer, there's an online payment
7    to Toyota Financial Services in the amount of one
8    thousand, seven hundred dollars?
9    **A**    I'm taking the Fifth.
10   **Q**    Is that a payment for your wife's car?
11   **A**    I'm taking the Fifth.
12   **Q**    And do you see that there are a series of
13   payments through Zelle, which is on an online payment
14   system used by banks, to Luke Trikantzopoulos?
15   **A**    I'm taking the Fifth.
16   **Q**    And there are five transfers of two
17   thousand dollars and then a sixth transfer of one
18   thousand dollars?
19   **A**    I'm taking the Fifth.
20   **Q**    Was this money transferred to Luke in
21   August 2020 to pay for his Babson tuition?
22   **A**    I'm taking the Fifth.
23   **Q**    Why were the payments structured as
24   separate payments of two thousand dollars?
25   **A**    I'm taking the Fifth.

121

1    **Q**    Were you or your wife trying to avoid
2    having the bank flag the payments?
3    **A**    I can answer that. No. They wouldn't
4    allow. Mr. Harper, I have no idea why the phrasing of
5    such a simple stuff like that. Zelle does not allow to
6    have a bigger transfer. It was a limitation with the
7    system. But they continue to try to create a story, an
8    accusation, a guilt factor. It is not -- it is not --
9    I have nothing to say. Your question suggest lack
10   of -- of basic -- you're trying to intimidate. That's
11   all you're trying to do. You're trying to make me --
12   **Q**    Let me ask you this --
13   **A**    I was not trying to do anything. I was
14   not trying to hide anything. I'm not trying anything
15   that you're suggesting even directly or indirect ever.
16   And you're trying to create facts of circumstantial
17   evidence, sir.
18   **Q**    Exhibit 44 is an account statement for a
19   checking account, correct?
20   **A**    I'm assuming Fifth.
21   **Q**    Okay.
22          I mean, it says right on Exhibit 44,
23   Checking Summary, right, Chase Total Checking right
24   there on the first page of Exhibit 44?
25   **A**    Mr. Harper, I do not know -- I will

122

1    repeat, and I will continue repeating that.
2    **Q**    Why didn't your wife just write a check to
3    Babson for the tuition instead of transferring
4    thousands of dollars in small incremental payments to
5    Luke?
6    **A**    I'm going to tell you something very
7    simple. I'm not hiding anything. You cannot hide
8    anything today. To suggest that somebody is trying to
9    hide something when the Securities and Exchange
10   Commission, the United States government is behind you
11   is insulting to my -- to everybody's intelligence here.
12   Okay? Even to suggest that. The -- you're trying to
13   intimidate me. This is not a valid question. This is
14   a process that you know. You're tired. You're trying to
15   do it. You're trying to create a situation.
16          THE COURT REPORTER:  Sir, I need you to
17   repeat the last part, please.
18          THE WITNESS: It doesn't look like -- it
19   look like a -- it looks like a first interrogation,
20   sir. It doesn't look like a question and answer
21   situation.
22   BY MR. HARPER:
23   **Q**    I'm sorry you feel that way. The only
24   thing I'm asking you is, why didn't your wife write a
25   check to Babson instead of making these incremental

123

1    payments?
2    **A**    My answer is, I do not know. I do not
3    know. I don't remember the reason. Okay? But it has
4    nothing to do with what you're trying to instigate here
5    and trying to suggest. You clearly have stated in your
6    previous statement, that we're trying to hide
7    something, shame on you. I live in Boston, and you're
8    treating me like I'm an idiot.
9    **Q**    No, that's not true at all. I'm just
10   asking question.
11          Does Black Falcon Capital have an office
12   in Boston?
13   **A**    No, it does not. Black Falcon was
14   supposed to open operations when I would come back to
15   Boston. Unfortunately, will all of this happening with
16   COVID, then the circumstances, I couldn't come back to
17   Boston.
18   **Q**    Has Black Falcon Capital ever had an
19   office in Boston, Massachusetts?
20   **A**    No. Black Falcon never had an office
21   anywhere. Black Falcon never did business in the
22   United States, so --
23          (SEC Exhibit 45 was marked for
24          identification.)
25

124

BY MR. HARPER:

2    Q    All right. So I'm now showing you
3 Exhibit 45. Do you have that before you?
4    A    Yes.
5    Q    And do you see that it's a signature card
6 for a bank account for Black Falcon Capital?
7    A    Yes. I'm taking the Fifth, sir.
8    Q    I'm sorry?
9    A    I'm taking the Fifth.
10    Q    I see.
11         And do you see that the business address
12 on this signature card for Black Falcon Capital lists
13 its address at 1 Boston Place, Suite 2600, Boston,
14 Massachusetts 02108-4420? Do you see that?
15    A    Yes, I do.
16    Q    But Boston -- or excuse me, Black Falcon
17 Capital has never had an office in Boston, right?
18    A    No. We weren't -- Mr. Harper, this is
19 very simple. You're trying to make it up and show --
20 we wanted to open the business in Boston Place. It's
21 an easy way for me, but COVID had hit, I don't even
22 remember now, but the whole situation was very simple.
23 Okay. We wanted -- I want to have an office in Boston.
24 That's all it was. I wanted to have the office in
25 Boston. October 20th -- so I was still -- I don't even

125

1 remember where I was, in the Emirates or in Greece.
2 Okay.
3         So we started -- actually, the bank ended
4 having my residential address in the system, because,
5 again, I was trying to put things together, sir. I was
6 not trying to mislead or -- everybody's doing something
7 like that. I'm not trying to mislead people.
8    Q    Just to be clear, I just want to make sure
9 the record's clear, Black Falcon Capital has never had
10 an office at Suite 2600, One Boston Place, right?
11    A    No. Actually, even the bank knew when I
12 opened the account, we're planning to have this. For
13 the moment, we're not going to have it, but we were
14 planning to do that. And actually, I told them, please
15 use a different address, because I was not planning --
16 we just opened the account. Because they wanted -- I
17 don't remember what they told me at the bank.
18    Q    Black Falcon Capital has never had an
19 office at Suite 2600, One Boston Place; isn't that
20 true?
21    A    I'm taking the Fifth, sir.
22    Q    On Exhibit 45 has listed your name and
23 your wife's name. Are those your signatures on Exhibit
24 45 first page?
25    A    Yes, they are.

126

1    Q    Why did you open this account for Black
2 Falcon Capital at JP Morgan Chase when it already had a
3 bank account at Fifth Third Bank?
4    A    Because Mr. Charabakis and -- I didn't
5 have access to that account because Mr. Charabakis and
6 Mr. Henderson after the call that Mr. London gave them,
7 they refused to participate anymore.
8    Q    I see.
9         And so you transferred the hundred and
10 thirty-nine thousand dollars that appears on the fourth
11 page of Exhibit 45, so that you would have access to
12 that money?
13    A    Yeah, that was the purpose of it. I'm not
14 hiding that.
15    Q    No. I understand.
16         And you see what I'm talking about, the
17 deposit of a wire transfer from Fifth Third Bank into
18 this JP Morgan Chase account that was dated
19 October 8th, 2020?
20    A    Yes, I do. Yes, I do.
21    Q    Okay.
22         I'd now like to ask you some questions
23 about some withdrawals from this account. I'm now
24 showing you page eight of Exhibit 45, which shows the
25 electronic withdrawals on this account. Do you see it

127

1 before you?
2    A    Yes. Mr. Harper, I'm going to be using
3 the Fifth anything related to any transaction related
4 to Chase and Black Capital and the personal account
5 related to that.
6    Q    Okay. I understand.
7         So is it true that on October 13th, you
8 wired seven thousand, five hundred dollars of this
9 money that came from Fifth Third Bank to Twohig Caplan,
10 which is a law firm that represented your wife in an
11 SEC deposition?
12    A    I'm taking the Fifth.
13    Q    And isn't it also true that on October
14 14th, 2020, as shown in this bank account statement,
15 that you wired twenty-five thousand dollars to your
16 church, which is the Holy Transfiguration Monastery?
17    A    I'm taking the Fifth.
18    Q    Prior to accepting Werner Fuls's four
19 hundred thousand dollar investment, did you tell him
20 that you had been sued by the Securities and Exchange
21 Commission for securities fraud?
22    A    I'm taking the Fifth.
23    Q    Prior to accepting Werner Fuls's four
24 hundred thousand dollar investment, did you tell him
25 that you would be using his investment money to hire a

128

1  lawyer to represent your wife in our proceeding?
2      A    I'm taking the Fifth.
3      Q    Prior to accepting Werner Fuls's four
4  hundred thousand dollar investment, did you tell him
5  that you would be using his investment money for
6  donations to your church?
7      A    I'm taking the Fifth.
8      Q    Have you offered shares of Black Falcon
9  Capital to any other investors?
10     A    I'm taking the Fifth.  I don't recall, but
11 I'm take the Fifth, so I doubt.
12     Q    Other than 38 Ventures, Navis Ventures,
13 Noah Capital, Pevadi Brothers, and Black Falcon, have
14 you formed any other investment companies?
15     A    I don't consider any of the companies you
16 mentioned an investment company, number one.  Number
17 two, I have never formed any investment company.  I
18 have used family funds to participate in investments,
19 but I have never formed any investment company around
20 the globe, never.
21     Q    So other than -- well, let me ask it this
22 way.  Have you solicited anyone to invest in any
23 business, other than 38 Ventures, Navis Ventures, Noah
24 Capital, Pevadi Brothers, or Black Falcon?
25     A    I have discussed business opportunities in

129

1  different capacity since -- before long, long, long
2  time, not in the United States, mostly abroad.
3      Q    Since your SEC investigation testimony in
4  November of 2019, have you formed any other business
5  entities in the United States?
6      A    The only one that I have formed, I don't
7  remember the date, was Black Falcon.  I don't remember
8  the date.  Before or after, I don't remember.
9      Q    Since forming Black Falcon, have you
10 formed any other business entities in the United
11 States?
12     A    I have not formed in the United States or
13 abroad, actually.
14          (SEC Exhibit 46 was marked for
15          identification.)
16 BY MR. HARPER:
17     Q    All right.  I'm now going to show you what
18 has been marked as Exhibit 46.  Do you see Exhibit 46
19 before you?
20     A    Yes, I do.
21     Q    Okay.  So I'm going to scroll through it
22 because I want you to see the whole thing.  This is
23 page one.  This is page two.
24     A    I am familiar, sir.
25     Q    Okay.  But it's important for me to show

130

1  you the whole thing, so that you're familiar with it.
2  Page three, do you see page three?
3      A    Uh-huh.
4      Q    Page four, do you see page four?
5      A    Yes, I do.
6      Q    Okay.
7          Page five?
8      A    Yes, I do.
9      Q    Do you see it?
10     A    Uh-huh.
11     Q    Page six, do you see that?
12     A    Yes.
13     Q    And page seven, do you see that?
14     A    That's correct.  Yeah.
15     Q    All right.
16          So what is Exhibit 46?
17     A    It was a marketing document that I was
18 preparing.  It was never circulated.  Mr. Jason -- I
19 don't remember his name -- illegal circulated that
20 without my permission.  That's a different story, but
21 we never circulated this.  We were building.  I was
22 trying to put something together.  Hopefully, I was
23 going to do something in the future.  That's about it.
24     Q    All right.  So let me show you page two.
25 Is that a picture of you on page two?

131

1      A    Yes, it is.
2      Q    All right.
3          And it has your name and your title at
4  Navis Ventures, right, managing partner?
5      A    That's correct.
6      Q    And on the right-hand side there is a
7  description of your background, right?
8      A    That's correct.  And I would like explain
9  on this one, but I'm taking the Fifth.  So any question
10 you ask me, I'm going to take the Fifth because I'm
11 tired, and I have plenty to say, but I'm not in a
12 position to do it now.
13     Q    All right.  So let me tell you this.  This
14 is the last section of questions that I have for you.
15 We're almost done.  So would you like to take a break
16 for a few minutes?
17     A    No, I don't want to take a break, if you
18 don't mind.  I'm -- Mr. Harper -- your effort to stay
19 up with my accent and my situation here, but I'm also
20 very tired -- but please let's continue, if you don't
21 mind.  If you want to have a break or the other
22 professionals would like to have a break, that's a
23 different story, but.
24     Q    No.  As I said, this is the last section,
25 so if you're comfortable moving forward, we'll just

132

1  move one.
2      A    I would prefer to move on because I'm
3  getting very tired.  Thank you.
4      Q    Sure.  That's fine.
5          So when you went to family office events
6  to participate in panels, is the substance of what you
7  would tell people about your experience and
8  professional background summarized here on page two of
9  Exhibit 46?
10     A    No, that would not be accurate.  The
11 statement wasn't accurate.
12     Q    Why?  What's inaccurate about page two?
13     A    Because I was not presenting this --
14 because the reason I was going to the family office to
15 get a connection with other family office, not to
16 promote myself as something that they need my services
17 for.
18     Q    Okay.
19          Let me ask you a different way.  When you
20 met potential investment partners, like Constantine
21 Antonas and Fuls, Werner, is the substance of how you
22 described your investment experience and professional
23 background the same as you set it out here in page two?
24     A    It gives a good representation.  I would
25 have phrased it very differentially in a conversation.

133

1      Q    Why?
2      A    Because it's completely different from
3  what people write down.
4      Q    The write up here says that you've led
5  your family's office since you were twenty-four, right?
6      A    That's correct.  Yeah.
7      Q    And it says, under your leadership, the
8  family office has successfully continued its focus on
9  acquiring private companies?
10     A    That's correct.
11     Q    And what family office is this that has --
12     A    Mr. Harper, we're --
13     Q    -- performed well under your leadership?
14 What family office is it?
15     A    I'm taking the Fifth, but now we're
16 getting an area that's a little bit grey, and I'm very
17 direct with you, because the definition of family
18 office in London, Greece, China, and the United States
19 and within the shipping environment that I was in, vary
20 substantially to what you might think or to what other
21 people might think in China or in Singapore or in the
22 Emirates, and how people use it.  This document was
23 never circulated.  You're trying to say that I
24 not -- it was not.  Maybe one to two people might have
25 seen it, and maybe one to two people illegal have seen

134

1  it, and they thought it was very different, but it was
2  not trying to make an impression that you're trying to
3  suggest here.  Okay.
4      Q    But what is the name of the office, the
5  family office that you led for twenty-seven years?
6      A    There was -- it was no name.  It was my
7  family office.
8      Q    So it was the Basil Trikantzopoulos
9  office?
10     A    There was no name.  I was using family
11 funds for different investments.
12     Q    Right.  And you said you led the office
13 for twenty-seven years.  Was it the Trikantzopoulos
14 family office?  Is that what it was called?
15     A    Your -- Mr. Harper, I'm not sure how
16 familiar you are with that family office law, their
17 activities, the way they phrase things, and what they
18 do, but I can state to you that I am extremely familiar
19 with the single family office law in many different
20 ways, and I understand this better than many other
21 professionals around what it means.  You have a very
22 specific way to express this.  I am suggesting that
23 it's very different about what you think is a family
24 office from people of Nicaragua when they come to Miami
25 think about a family office, what Singapore that has

135

1  been going around talking about family office when they
2  come to the United States, and how many people have
3  presented themselves as questionable entities and not
4  even family offices.  I'm not going to even discuss
5  this because this is my passion and my very sensitive
6  area.  You can say the question, but I'm taking the
7  Fifth from now on, so --
8      Q    Okay.
9          So what is the name of the family office
10 that you led for over twenty-seven years.
11     A    Mr. Harper, there's no name.  You're
12 trying to make a name of family office, and you're
13 trying to make it in a way that is very different.
14 When I was --
15     Q    I'm sorry.  You cut off.
16     A    Mr. Harper, it's like asking my father in
17 1955, what was the name of the family office, he would
18 be laughing at you.  In 1955, I wouldn't call it a
19 family office.  It became a definition much later.
20 Even today people vary on what they mean by family
21 office, Mr. Harper.  You know that.
22     Q    But in page two of Exhibit 46, you say,
23 "Under his leadership, the family office has
24 successfully continued its focus on acquiring private
25 companies; thereby, maintaining the basic tradition and

136

1 strategy it began in 1949," right?
2    A    That's correct.
3    Q    So you called it a family office.
4    A    Yeah.  I mean, in different stages, we
5 might have some type of a name because of an entity
6 that we have most of our money.  Like I can tell you in
7 1984 an entity we had to control most of our funds, but
8 in many periods, we did not have a name.  We had simply
9 businesses that we were investing passively or
10 actively, but in small -- we considered it differently.
11 Nobody works the way you think it should be working,
12 sir.
13    Q    So in the second paragraph, it says that,
14 "Since 1995, Basil has been able to invest the family
15 funds while simultaneously allowing co-investments from
16 nine additional families," right?  Do you see that?
17    A    Yes, I do.
18    Q    Who are the other nine families?
19    A    I'm taking the Fifth in the very sensitive
20 areas.  I'm not going to involve people who are not
21 present or who are -- because you think it's your right
22 to know.
23    Q    So this case is about whether or not
24 you're telling investors the truth, so please give us
25 the names for each of these families, so we can verify

137

1 what you're saying is true.
2    A    Who is -- where are the investors who took
3 this?
4    Q    My understanding is that you told
5 investors, like Mr. Antonas and Mr. Fuls, that you had
6 twenty-seven years of experience --
7    A    Yeah.
8    Q    -- in investing your family's money with
9 other family offices, right, you told them that?
10    A    Yeah, I told people that.  Yeah.
11    Q    Yeah.
12        So tell us who the other family offices
13 are that you invested with them, so we can verify what
14 you told investors was true.
15    A    I'm taking the Fifth.
16    Q    Very well.
17        In December of 2010, you applied for a
18 full-time job as a concierge that was offered by
19 Palladion Services; isn't that right?
20    A    I'm taking the Fifth.
21        Mr. Harper, how much longer?  Because I
22 am -- I think there is --
23    Q    Not much longer.  We're almost done.
24        (SEC Exhibit 47 was marked for
25        identification.)

138

1 BY MR. HARPER:
2    Q    I'm showing you now what's been marked as
3 Exhibit 47.  Do you have it before you?
4    A    Yes.
5    Q    And is this an application for employment
6 that you filled out and submitted to Palladion
7 Services?
8    A    Yes.
9    Q    Is that your handwriting on Exhibit 47?
10    A    Yes.
11    Q    And if we turn to the third page of
12 Exhibit 47, you have listed there your employment
13 history?
14    A    That's correct.
15    Q    And the first thing you have listed is
16 Pevadi 2; is that right?
17    A    That's correct.  Yeah.
18    Q    And Pevadi 2 was a consulting business
19 that you had formed that was focused on cloud computing
20 solutions; isn't that right?
21    A    Actually, no, but that's a different
22 story.
23    Q    So what was Pevadi 2?
24    A    I don't remember, but as far as I
25 remember, it was -- the goal was, again, to grow some

139

1 type related to software and technology related
2 activity, but I don't remember now the specifics.
3    Q    Okay.
4        In any event, it wasn't a vehicle for
5 soliciting family office investments, right?
6    A    No, no -- no.  I did not -- there is a
7 whole story that makes -- I will present to you at the
8 right moment, sir, but that's enough.  Go ahead.
9        (SEC Exhibit 48 was marked for
10        identification.)
11 BY MR. HARPER:
12    Q    All right.  I'm showing you now what's
13 been marked as Exhibit 48.  Do you have that before
14 you?
15    A    Yes.
16    Q    Let's scroll through it.  Do you see that
17 the first and second page of -- actually, the first
18 page of Exhibit 48 is a copy of the Pevadi 2, LLC
19 website page, About Us?
20    A    Yes.
21    Q    Is that a picture of you?
22    A    That's absolutely right, yeah.
23    Q    And did you create this web page for your
24 Pevadi 2 business?
25    A    Yes, I did.

140

1    **Q**   Okay.
2    And is the narrative that's written here,
3 was that written by you?
4    **A**   Yes.
5    **Q**   And if we turn to the second page, this is
6 the web page that describes the services that were
7 offered by Pevadi 2?
8    **A**   Yes.
9    **Q**   And did you draft the narrative that's on
10 this page?
11    **A**   Mr. Harper, I can tell you that I might
12 have probably created different websites during the
13 last -- I don't even know when I started, but this
14 website, if you go and check out how many people saw
15 it, I have never shown that to anybody. I don't think
16 I have ever showed that website to anybody. I had it
17 there because I was trying to figure out if I'm going
18 to do something in that area, but nothing more. I was
19 hoping that I was going to instigate my younger brother
20 to do something with me then, but his condition --
21 Pevadi comes from the initials of the three brothers,
22 by the way.
23    **Q**   Say that -- what was by the way at the
24 end? I didn't catch that.
25    **A**   I apologize. The name Pevadi is from the

1 initials of the three brothers.
2    **Q**   So the V is your name?
3    **A**   The V-A, V-A.
4    **Q**   Okay. I see.
5    And the P-E is one brother, and the D-I is
6 another brother?
7    **A**   That's correct. Yeah. I was always a
8 little bit optimistic that we would put some things
9 together as brothers at some moment, but that's about
10 it.
11    **Q**   I see.
12    All right. Going back to Exhibit 47 and
13 the list of employment history on page three of
14 Exhibit 47. Do you have it before you?
15    **A**   Yes, I do.
16    **Q**   All right. After the Pevadi listing, it
17 has -- you have written there Wackenhut. Do you see
18 that?
19    **A**   That's correct. Yeah.
20    **Q**   And what did you do at Wackenhut between
21 August of 2006 and May of 2009?
22    **A**   It was the security business, sir.
23    **Q**   Does that mean that you provided physical
24 security, like walking around in a uniform?
25    **A**   That's correct.

1    **Q**   Okay.
2    And then the next entry for employment
3 history on the next page, page four, it looks like the
4 company name is D&Z?
5    **A**   They changed their name, if I remember
6 correctly.
7    **Q**   But what do you have written there, D --
8    **A**   D&Z. D&Z.
9    **Q**   Oh, it's like the ampersand, D, ampersand,
10 & Z, right?
11    **A**   Yeah. It was a company -- yeah. It's --
12 yeah. Yes. Correct.
13    **Q**   All right.
14    And so from December 2004 to August 2006,
15 then you were providing security services through D&Z?
16    **A**   Among other things.
17    **Q**   What were the other things?
18    **A**   Sir, I was working my -- I was working
19 during the day for my family, and at night, I was doing
20 this.
21    **Q**   Okay.
22    And when you say working for your family,
23 what do you mean?
24    **A**   Family business.
25    **Q**   Okay.

1    **A**   The investments.
2    **Q**   Okay. We'll come back to that. Okay?
3    And then the next entry after D&Z is New
4 York Life; is that right?
5    **A**   That's correct.
6    **Q**   And you worked there from December of 2002
7 to December of 2004?
8    **A**   That's correct. Yeah.
9    **Q**   And you were an investment professional?
10    **A**   Yeah. I don't remember how they call
11 them. Financial advisors, they call them. I don't
12 remember now.
13    **Q**   Sorry. I got it wrong. On the form
14 you've written financial services professional; is that
15 correct?
16    **A**   Yes. What we call today, I think,
17 financial advisor. I don't -- but, you know, you're
18 looking for -- yeah.
19    **Q**   All right.
20    Did you sell stocks or mutual funds,
21 bonds, anything like that?
22    **A**   It was mostly insurance related. I had
23 licenses to sell mutual funds or whatever -- yeah.
24    **Q**   And then the reason for separation, you
25 have something crossed out there, and then it's like,

1  not a sales something.  What do you have written there?
2      A    I cannot see it.
3      Q    Do you reason for separation?
4      A    I see the reason for separation because
5  it's typed, but then I see that I have scrambled
6  something, and then I see a note, but I cannot see what
7  I write next to it, so -- simply, I cannot see it.  I
8  cannot see it now.  I don't know if you can zoom it.
9      Q    Sure, I can zoom it.  Is that better?
10      A    Not a sales -- I'm not sure -- I'm not
11  quite sure what I was referring to.  I don't even know
12  what I was saying.  Not a sales -- I don't know what it
13  is, but -- your guess is as good as me.
14      Q    Could it be not a salesperson?
15      A    Why wouldn't I write the full thing since
16  there is space.  I don't know.  I don't know what is,
17  sir.
18      Q    All right.  So moving on to the next entry
19  for your employment history is Morgan Stanley.  Do you
20  see that?
21      A    Yes.
22      Q    You were worked there from October 2000 to
23  April 2002?
24      A    Correct.  Correct.
25      Q    And your last position was financial

145

1  advisor?
2      A    That was the only position I had there,
3  yes.
4      Q    Where was the Morgan Stanley office that
5  you worked at?
6      A    At Corporate Place.
7           THE COURT REPORTER:  I'm sorry.  Where?
8  Where was it?
9           MR. HARPER:  Corporate Place.
10           THE WITNESS:  Corporate Place.  They had
11  two offices then.  The had one in Corporate Place,
12  and I think they had one at 53rd Street, but I don't
13  remember where it was the second one.
14  BY MR. HARPER:
15      Q    And in that position, did you offer sales
16  of securities, like stocks?
17      A    Yes.  I was fully licensed and supervised.
18  Yes, like any other financial advisor.
19      Q    The reason for separation that you have
20  written there, it says, "Office was closed due to SEC
21  investigation;" is that right?
22      A    That's correct.  Yeah.
23      Q    What was the issue that led to the SEC
24  investigation?
25      A    There was a broker that reported that

146

1  there was -- they were being forced by Morgan Stanley
2  office manager -- I don't remember how you call them,
3  the guy who runs the office to sell -- to promote
4  Morgan Stanley products instead of what is better for
5  the client.  I don't remember the -- but they were
6  trying to get, basically, just to sell Morgan Stanley
7  products because the commission was higher, so the
8  manager was pushing some of the brokers to do so, and
9  one of the brokers was resisting, and I think he
10  reported that.  And I think the SEC came, and they said
11  until we figure it out, the office have to close,
12  something like that.  I don't remember the specifics.
13  It was something like that.  It was an argument between
14  the branch manager, let me put it that way, with a
15  specific broker.  This was also in the news, I think.
16      Q    Okay.
17           All right.  So let's go back to the Pevadi
18  2 entry.
19      A    Yes, please.
20      Q    So this was -- Pevadi 2 was a business
21  that you had started on your own, is that right, that
22  you list yourself as the founder?
23      A    Yes, that's correct.
24      Q    All right.
25           And for how long did you continue to run

147

1  that business?
2      A    Mr. Harper, the SEC do not remember.  I
3  sincerely don't remember.  I was trying to figure out
4  what I was going to do.  There was a situation with my
5  younger brother, certain things happen.  My younger
6  brother wanted me to leave the United States, go back
7  to Greece.  There was a whole mess about different
8  things.  So I was trying to figure out where I'm going
9  to stay, what I'm going to do, if my family was going
10  to stay in the United States or not.  But it was
11  after the -- it was a period that I was trying to see
12  if I'm going to stay in the United States or not.  I
13  don't remember more than that.
14      Q    Okay.
15           And as you described it, it was a business
16  that you're trying to get off the ground; is that
17  right?
18      A    I was -- well, I was not even trying to
19  get off the ground to be direct here.  Okay.  I was
20  trying to figure out if I'm going to do something
21  related to cloud computing and related services, and if
22  I'm going to invest money in that business, if I'm
23  going to persuade my younger brother to be part of it,
24  and if we're going to go back to Greece because it was
25  a situation that I was hoping to do something related

148

1  to -- with my younger brother.  That's all, but it was
2  never meant to be.
3     Q     But nowhere in this employment application
4  do you list working for the family office doing
5  investing, right?
6     A     Mr. Harper, I -- it is -- I'm trying to
7  explain.  I was applying to -- that was Palladion
8  Services, correct?
9     Q     I'm sorry?
10    A     That was Palladion Services, correct?
11    Q     Yes.  Yes.
12    A     I had contacts -- I grew up around a lot
13  of different people, let me put that way, okay, and
14  this -- was completely unfamiliar with me, so I thought
15  that if I want to get a job there, I shouldn't say
16  things that they would look to them that I'm not going
17  to stay with them.  It's like there's a crisis.
18  Everybody's trying to find a job now with COVID virus.
19  Everybody's applying anywhere they can.  And, of
20  course, some of these companies, no, this guy's not
21  going to stay long, he's going to leave, and then what
22  I'm going to do with role?  They think like that.  So I
23  said I'm not going to tell them that.  I don't think I
24  put that I had college degrees.  I was avoiding to put
25  I had a masters degree.  I was trying to get the job

149

1  then.  But, again, you guys want to treat that as a
2  situation, not sincere, that I'm doing the wrong
3  according to you.  I'm not doing the wrong thing.  I
4  was trying to get a job.  That's all.
5     Q     So I'm now showing you page six of this
6  employment that has the education section.  You had
7  listed there both Athens College where you graduated
8  from high school, and the also your Babson College
9  degree, right?
10    A     Yes, that's correct.  I didn't list my
11  masters degree, and I don't think I listed --
12    Q     And applying for this security or
13  concierge, building concierge job, you listed your two
14  years of employment, approximately, with Morgan Stanley
15  as a financial advisor, right?
16    A     Yes, what it says there.  Yes.  Yes.
17    Q     And you also listed the two years that you
18  worked as a financial services professional with New
19  York Life, right?
20    A     That's correct, yeah.
21    Q     And you also listed the business that you
22  were starting to -- or that you were --
23    A     Yes.
24    Q     -- that you made a website for and were
25  trying to start with your brothers doing cloud

150

1  computing, right?
2     A     Well, I was not trying to start with my
3  brothers.  I was trying to do it, and then invite my
4  younger brother, so --
5     Q     Right.  But it had to do with cloud
6  computing for small midsize businesses, right?
7     A     It had to do with software and because I
8  had the background in software, and I also was -- it
9  was almost like a thing I like to do on the side, and I
10  thought it was -- maybe there is a potential to do
11  something much bigger, yes.
12    Q     Let's put it this way, it had nothing to
13  do with building security or the concierge services
14  business, right?
15    A     No, nothing to do with that.  No?
16    Q     And, again, nothing in this application
17  that you submitted in your own handwriting about
18  working for your family office doing investments with
19  other -- co-invest with other family offices, right?
20    A     The same reason that I did not put my
21  masters degrees, sir, or my computer degree.
22          (SEC Exhibit 49 was marked for
23          identification.)
24  BY MR. HARPER:
25    Q     All right.  So I have another exhibit to

151

1  show you.  This is -- I'm showing you now what's been
2  marked as Exhibit 49.  Do you see that it's an employee
3  affidavit?
4     A     Okay.
5     Q     Do you see the title of it is, Employee
6  Affidavit?
7     A     Yeah.  Correct.
8     Q     And is that your signature, the signature
9  of the applicant at the bottom?
10    A     That's correct.
11    Q     And within this affidavit you list your
12  previous business or occupations, right?
13    A     That's correct.
14    Q     And within that you've listed Pevadi 2,
15  Wackenhut, D&Z, New York Life, and Morgan Stanley,
16  right?
17    A     That's correct.
18    Q     And you signed this affidavit under the
19  pains and penalties of perjury in December -- or on
20  December 9th, 2010, right?
21    A     That's correct.
22          MR. HARPER:  All right.  So I think I'm
23  almost done.  I'd just like to take a break.  So why
24  don't we take a break for about ten minutes.  I'm
25  pretty close to being done.

152

1       (Whereupon, at 1:04 p.m., a short recess
2       was taken.)
3   BY MR. HARPER:
4       Q    I just have a few more things that I want
5   to wrap up. I'm done with the substance of our -- with
6   your deposition.
7       So let me ask you this: Are you aware
8   that the end of fact discovery is coming up next
9   Monday, April 26th?
10      A    This is the end of -- can you repeat that,
11  sir?
12      Q    Fact discovery. So in the US in the
13  district court where this case is being litigated,
14  right, there's a period of time when the parties get to
15  exchange discovery; meaning, to send interrogatories
16  and requests for admissions and to take depositions,
17  and at that period is coming to a close next Monday,
18  April 26th.
19      A    Okay. I was not aware.
20      Q    Okay.
21      And Mr. -- I'll showing show it to you
22  again. Mr. London sent you this Email on April 5th
23  that I've marked as Exhibit 14, right? And attached to
24  it are not only the deposition notice, which is on page
25  three, but also the interrogatories that we served on

153

1   your previous counsel at Burns & Levinson. And these
2   interrogatories are written questions, basically, that
3   needed to be answered within thirty days. And if
4   you're going to respond to them, you need to respond to
5   them before next Monday at the close of discovery.
6       A    Okay. Thank you for letting me know.
7       Q    Yes.
8       And there's a third thing. Okay? There
9   is what we call a Request for Admissions that we also
10  served upon your counsel. I don't believe they're
11  attached to Mr. London's Email, but we could forward
12  you copy of it after this deposition. And, again, like
13  the interrogatories, if you're going to respond to it,
14  you need to do it by the close of discovery, which
15  April 26th, next Monday.
16      A    May I, Request for Admissions, what it
17  means? What is that?
18      Q    Sure. Yes. So we put in writing certain
19  things we believe to be true, right, and either you're
20  going to admit it or deny it.
21      A    Oh, okay.
22      Q    If you're going to deny it, you need to
23  put in specific responses citing factual details, like
24  documents or testimony showing why you do not agree.
25      A    Okay. This is the same date?

154

1       Q    Yes, the 26th, Monday.
2       A    The 26th. Okay.
3       Q    But technically, you're already overdue,
4   but I understand that you're not currently represented
5   by counsel, so I think it's fair to put you on notice
6   of these things.
7       A    Thank you. I appreciate that.
8       Q    Okay.
9       During the course of the deposition, have
10  you been talking to anybody on the phone?
11      A    No, not on the phone. I have to talk to
12  somebody else about something completely different.
13      Q    About what?
14      A    About something completely different than
15  this. Not about the deposition, no.
16      Q    Okay.
17      And I understand that you have been living
18  in Greece and the United Arab Emirates. Do you have
19  any plans to come back to the United States?
20      A    I would like to.
21      Q    But do you have plans to do so?
22      A    Well, it's a complicated situation simply
23  because of traveling restrictions and vaccinations, who
24  accepts what. I have to decide if I'm going to do the
25  Chinese or Pfizer, as an example. It's a little bit --

155

1   and then if Greece is going to have a passport for
2   immunization, if I'm going to take it from Greece or
3   not. There's a lot of different things. But I have to
4   come to the United States because I really need to do
5   some things there. Let me put it that way, I have not
6   planned a specific date, but I'm planning to come back
7   to the United States.
8       Q    Are your wife and son still residing here
9   in the United States?
10      A    Yes, they are. Yeah.
11      Q    Okay.
12      MR. HARPER: Okay. All right.
13  Mr. Trikantzopoulos, thank you for your time today at
14  this deposition. We're going to conclude the
15  proceedings for today.
16      And if you want to order a transcript of
17  your deposition, you do it through Ms. Rothstein, who
18  is the Court Reporter.
19      THE WITNESS: Okay.
20      MR. HARPER: It cost money. I don't
21  know. I can't tell you the precise amount, but,
22  Ms. Rothstein -- if you want to, you should get her
23  Email address. Actually, can we do that on the
24  record, Brigitte? Can you give him your contact
25  information?

156

| | |
|---|---|
| 1      THE COURT REPORTER:  I actually need his | 1      REPORTER'S CERTIFICATE |

1      THE COURT REPORTER:  I actually need his
2  Email, so I can send him an order form if he needs to
3  order it.
4      THE WITNESS:  Mr. London has my Email
5  address anyway, so he can share that with her.  Okay?
6      MR. HARPER:  Can we just confirm before
7  we go off the record?  It's B-A-S-I-L-T-R-I-K-A-T-Z
8  at gmail.com?
9      THE WITNESS:  That's correct.
10     MR. HARPER:  So that's where you'd want
11  the order form sent to?
12     THE COURT REPORTER:  Correct?
13     MR. HARPER:  That's where you want --
14     THE WITNESS:  That question was for me?
15     MR. HARPER:  Yes.
16     THE WITNESS:  Yes, please.  Yes, please.
17     MR. HARPER:  Okay.  All right.  Very
18  well.
19     Thank you for your time.
20     (Whereupon, at 1:18 p.m., the proceeding
21     was concluded.)
22
23
24
25

157

---

1      REPORTER'S CERTIFICATE
2  STATE OF FLORIDA    )
              ) ss
3  COUNTY OF MIAMI-DADE   )
4
5     I, BRIGITTE ROTHSTEIN, a duly certified
      stenograph court reporter in and for the State of
6  Florida, do hereby certify:
      That I reported the taking of the VTC deposition
7  of the Witness, VASSILIOS TRIKANTZOPOULOS, at the time
      aforesaid;
8     That prior to being examined, the Witness was by
      me duly sworn in to testify to the truth, the whole
9  truth, and nothing but the truth;
      That I thereafter transcribed my shorthand notes
10  into typewriting and that the typewritten transcript of
      said VTC deposition is a complete, true, and accurate
11  record of the proceedings to the best of my ability.
      I further certify that (1) I am not a relative,
12  employee, or independent contractor of counsel of any
      of the parties; nor a relative, employee, or
13  independent contractor of the parties involved in said
      action; nor a person financially interested in said
14  action; nor do I have any other relationship with any
      of the parties or with counsel of any of the parties
15  involved in the action that may reasonably cause my
      impartiality to be questioned; and (2) that transcript
16  review was requested.
      IN WITNESS WHEREOF, I have hereunto set my hand
17  in the County of Miami-Dade, State of Florida, this
      30th day of April 2021.
18
19
20
21     _____
22     BRIGITTE ROTHSTEIN, STENOGRAPHER
23
24
25

159

---

1      CERTIFICATE OF WITNESS
2
3
4  I, VASSILIOS TRIKANTZOPOULOS, do hereby declare under
5  penalty of perjury that I have read the entire
6  foregoing transcript of my deposition testimony,
7  or the same has been read to me, and certify that
8  it is a true, correct and complete transcript of
9  my testimony given on April 20, 2021, save and
10  except for changes and/or corrections, if any, as
11  indicated by me on the attached Errata Sheet, with
12  the understanding that I offer these changes and/or
13  corrections as if still under oath.
14     _____ I have made corrections to my deposition.
15     _____ I have NOT made any changes to my deposition.
16
17  Signed: _____
      VASSILIOS TRIKANTZOPOULOS
18
19  Dated this _____ day of _____ of 20_____.
20
21
22
23
24
25

158

---

1      ERRATA SHEET
2  Deposition of:  VASSILIOS TRIKANTZOPOULOS
      Date taken:  APRIL 20, 2021
3  Case:  SEC v. TRIKANTZOPOULOS, et al.
4  PAGE  LINE
      _____ _____ CHANGE: _____
5     REASON: _____
6     _____ _____ CHANGE: _____
      REASON: _____
7
      _____ _____ CHANGE: _____
8     REASON: _____
9     _____ _____ CHANGE: _____
      REASON: _____
10
      _____ _____ CHANGE: _____
11    REASON: _____
12    _____ _____ CHANGE: _____
      REASON: _____
13
      _____ _____ CHANGE: _____
14    REASON: _____
15    _____ _____ CHANGE: _____
      REASON: _____
16
      _____ _____ CHANGE: _____
17    REASON: _____
18    _____ _____ CHANGE: _____
      REASON: _____
19
      _____ _____ CHANGE: _____
20    REASON: _____
21    _____ _____ CHANGE: _____
      REASON: _____
22
      _____ _____ CHANGE: _____
23    REASON: _____
24
      Signed_____
25  Dated_____

160